GRAYSONIA, NASHVILLE & ASHDOWN RAILROAD COMPANY v. NEWBERGER COTTON COMPANY.

Opinion delivered March 29, 1926.

1. EQUITY—JURISDICTION.—A complaint by the owners of certain bales of cotton destroyed by fire in a warehouse alleged that the warehouse company bound itself to deliver the cotton to holders of its receipts; that plaintiff had surrendered their receipts to the railroad company, which accepted the cotton for shipment and issued

bills of lading; that the railroad company was liable to plaintiffs as insurer, and the warehouse keeper was liable to the railroad company on account of its negligence; that the railroad company had policies on the cotton, and that the sum of $20,000 had been collected on such policies and held by the railroad company, but it refused to pay same to plaintiffs. *Held* to state a cause triable in equity, (1) to prevent a multiplicity of suits and furnish an adequate remedy, (2) to give plaintiffs the benefits of the doctrine of subrogation, and (3) to order distribution of the trust fund held by the railroad company.

2. CARRIERS—LIABILITY FOR COTTON LOST BY FIRE IN WAREHOUSE.—Where a·shipper surrenders all control over its cotton by delivering the warehouse receipts to a carrier for immediate shipment, and the carrier accepts the receipts in lieu of the cotton and executes its bills of lading therefor, the carrier at once becomes an insurer, and liable for the subsequent loss of the cotton by fire while in the warehouse.

3. TRUSTS—PAYMENT OF TRUST FUND INTO COURT.—Where a railroad company was carrying insurance in the sum of $20,000 to indemnify it against loss of cotton on which it had issued bills of lading, and the insurer, on the happening of a fire in a warehouse wherein the railroad company had cotton covered by bills of lading, had paid the above sum to the railroad company, which had deposited it in a bank, it was not error to order the fund paid into the court's registry for the benefit of those entitled thereto.

4. CARRIERS—SUBROGATION TO INSURANCE HELD BY SHIPPER.—Under a stipulation in a bill of lading that the carrier shall have benefit of insurance on the property "so far as this shall not avoid the policies," *held* that the carrier was not entitled to the benefit of policies held by the shippers which provided that the insurers shall not be liable "for merchandise shipped under a bill of lading containing a stipulation that the carrier may have the benefit of any insurance thereon."

5. INSURANCE—LIABILITY OF CARRIER—REIMBURSEMENT OF INSURER.—Where a fire insurance policy stipulated that the insurer should not be liable for merchandise shipped under a bill of lading, an agreement, entered into after a loss of goods while in the carrier's hands, whereby the insurer was to lend the shipper the amount of the loss, to be repaid only in so far as the shipper recovered from the carrier, and the shipper agreed to sue the carrier for the insurer's benefit, was a lawful arrangement.

6. CORPORATIONS—PROHIBITION AGAINST FOREIGN CORPORATIONS DOING BUSINESS.—A foreign corporation authorized to do business in the State is not prohibited from suing for the benefit of another corporation not authorized to do business in the State.

Appeal from Howard Chancery Court; *C. E. Johnson*, Chancellor; affirmed.

*J. G. Sain* and *DuLaney & Steel*, for appellant.

*Theodore L. Bailey* (New York) and *W. P. Feazel*, for appellee.

WOOD, J. Three separate actions were instituted in the Howard Chancery Court. The plaintiffs in the actions, the Newberger Cotton Company and the Lesser-Goldman Cotton Company, are foreign corporations authorized to do business in this State as cotton brokers, and during the year 1923 engaged in that business in this State. The actions were instituted against the Graysonia, Nashville & Ashdown Railroad Company, a common carrier for hire in this State with its line of railroad extending from Nashville to Ashdown, and the Mineral Springs Farmers' Union Warehouse & Marketing Company, a bonded warehouse company engaged in the warehouse business at Mineral Springs, Arkansas, a station on the railway company's line. The complaints in substance alleged that the railway company, prior to September, 1923, had constructed a sidetrack along the side of the warehouse of the warehouse company at Mineral Springs, Arkansas, for the purpose of receiving cotton and loading the same on cars for shipment from the warehouse of the warehouse company; that this was the only place from which the railway company received and accepted cotton for shipment at Mineral Springs; that the railway company had established a custom of issuing bills of lading for cotton stored with the warehouse company upon surrender to the railroad company of the warehouse receipts or tickets representing the cotton to be shipped. It is alleged that cotton was purchased by the plaintiffs and stored with the warehouse company, which company issued receipts for the cotton so purchased and stored, which receipts specified that such cotton would be delivered to the bearer of the receipt upon the surrender of the receipt and the payment of lawful charges; that these warehouse receipts were negotiable instruments, and that the title and right to possession of the cotton repre-

sented by them passed with their delivery. The plaintiffs alleged that they delivered to the agent of the railroad company at Mineral Springs on certain dates certain warehouse receipts for certain numbers of bales of cotton, and gave the agent directions for their shipment, and received in return from the agent bills of lading for the shipment of the cotton to the plaintiffs at Ashdown, Arkansas; that the railroad company neglected to ship the cotton as it was required to do under its contract, but instead allowed the cotton to remain in the warehouse of the warehouse company for an unreasonable length of time, and until the cotton was destroyed by fire on September 24, 1923. The plaintiffs alleged that the railroad company was liable to it as insurer on its contract of shipment for the loss of the cotton; that the warehouse company was liable to the holder of the warehouse receipts under the terms of the contract contained therein also as an insurer; that the fire that caused the destruction of the cotton was by reason of the negligence of the warehouse company in failing to maintain a watchman; that the railroad company had in its hands the warehouse receipts, and that, as holder of such receipts, it had a cause of action against the warehouse company for the loss of the cotton; that the plaintiffs had insured the cotton, but there was a provision in their contract of insurance to the effect that the insurer should not be liable for any loss or damage for any goods or merchandise in the possession or control of any common carrier or bailee, or where any carrier or bailee had effected insurance on the goods, and that because of said clause the plaintiffs were unable to enforce their claim against the insurance companies for the loss of the cotton. The plaintiffs alleged that the railroad company and the warehouse company had also effected insurance on the cotton in controversy; that they had collected their insurance, but had refused to pay the plaintiffs for the cotton; that, after such refusal, the insurance companies with which the plaintiffs had insured the cotton advanced to the plaintiffs the value of the lost cotton as adjusted

under those contracts upon an agreement of plaintiffs to repay the sums advanced only to the extent of any net recovery that the plaintiffs might have of the carrier or bailee on account of the loss or damage to the cotton, or any net recovery the plaintiffs might procure by reason of the insurance effected by the carrier or bailee on the cotton, and upon an agreement that the plaintiffs would with due diligence enter and prosecute suits against the railroad company, carrier, bailee, or other persons liable for said loss. The plaintiffs therefore alleged that these actions were instituted by them for the benefit of the insurance companies with which they had insured the cotton, and with whom they had made the agreements for the loan. They alleged that, if it should be determined that the railroad company is not liable for the loss of the cotton, then plaintiffs were entitled to be subrogated to any rights that the railroad company might have against the warehouse company for the loss of the cotton. The complaints concluded with a prayer in the alternative that the plaintiffs have judgment against the railroad company for the value of the cotton lost by fire, or, if it should be determined that the railroad company was not liable, that the plaintiffs be subrogated to the rights of the railroad company as the holder of the receipts as against the warehouse company for the value of the lost cotton. The complaints in all the actions were the same or similar, except as to the respective amounts claimed by each of the plaintiffs.

The defendants filed separate demurrers in which it is alleged that the complaints do not state a cause of action in equity, and that there was a misjoinder of parties. The court overruled the demurrers, and the defendants filed their separate answers, in which all the material allegations of the complaints were specifically denied. It was also set up that one of the insurance companies for whose benefit the action was brought was not authorized to do business in this State, and that the plaintiff, who was insured with that company, was not authorized to bring the action for the benefit of such

company. The answers concluded with a prayer, first, that the causes be transferred to the law court, and, second, that the plaintiffs take nothing by reason of the actions.

The testimony on behalf of the appellees tended to prove that they were cotton brokers, and that their agents, several years prior to 1923 and during that year, purchased cotton for them at Mineral Springs, Arkansas, a station on the appellant's railroad. Their agents would purchase the cotton, and it was stored in the warehouse company's warehouse, which company issued its receipts for same; that these warehouse receipts would be taken by plaintiff's agents to the agent of the railroad company, and that company accepted these receipts and issued bills of lading for the cotton. When the plaintiffs' agents delivered the warehouse receipts to the agent of the railroad company, and received its bills of lading, the cotton was ready for shipment, and was delivered by the plaintiff to, and accepted by, the railroad company for shipment. The railroad company's sidetrack on which it loaded cars with cotton for shipment ran by the door of the warehouse, and the cotton was loaded from the warehouse of the warehouse company. The railroad company had no separate warehouse in which cotton was stored, and from which same was shipped, but for several years it had been its custom to accept cotton for shipment, and to load same on its cars from the warehouse of the warehouse company. During the year 1923 it shipped only one carload of cotton from Mineral Springs that was not loaded on its cars directly from the warehouse of the warehouse company. That cotton was loaded on the car of the railroad company by the owners of the cotton on the track of the railroad company, and shipped direct to a co-operative cotton association. When the cotton in controversy had thus been delivered and accepted by the railroad company for shipment, and the company was ready to load the same on its cars, its depot agent at Mineral Springs would give one of the company's servants, employed for the purpose of loading the cotton, an order

containing the list and number of the bales of cotton to be shipped, and he would take the same to the manager of the warehouse company, who would turn over the cotton to the loader, and the same was loaded on the cars direct from the warehouse. The cotton was shipped out by the railroad company in the order in which it had issued its bills of lading, the cotton first received and accepted by it being shipped out first. As soon as the cotton was loaded on the cars for shipment, the loader would return the list of the cotton thus loaded to the station agent, who placed the same on his file, and turned over to the owner the warehouse receipts corresponding to the bales of cotton thus loaded for shipment.

There was testimony on behalf of the defendant, the railroad company, to the effect that the warehouse company charged the plaintiffs the sum of fifty cents per bale for weighing, sampling, and handling their cotton for shipment. The total receipts of the warehouse company for storage, insurance and handling the cotton, and for all services rendered by it to the plaintiffs, was the sum of $1.10 per bale. Before the railroad company could get possession of the cotton stored in the warehouse, it was the business of the warehouse company to segregate the cotton called for by the list in the hands of the loader, and check it in the cars. When the warehouse company had room, it kept the buyers' cotton segregated—each man's cotton to itself—but, when the warehouse was crowded, the cotton was all mixed up together, and the warehouse company had no means of knowing what bales it would be called upon to deliver for shipment until it received the shipping list. It was then the duty of the warehouse company to segregate the cotton according to such list, which it did before surrendering the possession of the cotton. When the cotton was loaded in the cars, the warehouse company took up its receipts and canceled them. The railroad company did not have any right in the warehouse or permission or authority to control any of the cotton while it was in the warehouse. During that time it was under the control of the ware-

house company. The railroad company had no authority
to load the cotton from the warehouse, and the manager
of the warehouse accepted the loader's check when the
cotton was loaded. The loader did not know where the
cotton was, and did not have any right to go into the
warehouse and get the cotton without the consent of
some officer of the warehouse company. The railroad
company had no keys to the warehouse. It didn't pay
anything to the warehouse company for storage and
insurance on the cotton while left in the warehouse.
It didn't surrender possession of the cotton or per-
mit the cars to leave until it had gotten the ware-
house receipts. The plaintiffs had never notified the
warehouse company that the warehouse receipts had
been delivered to the railroad company, and the railroad
company had not given the warehouse company any
notice that they held the warehouse receipts. The side-
track owned by the warehouse company from which cars
were loaded with cotton from the warehouse was under
construction for several years. The warehouse company
did the grading and furnished the ties, and the railroad
company furnished the steel. The only interest the rail-
road company had in the sidetrack was the right to
remove steel if the track should be abandoned and
removed.

The warehouse receipts recited, among other things,
that "said bale of cotton will be delivered to bearer hereof
upon surrender of this receipt and payment of all lawful
charges." It was shown that the warehouse was
destroyed by fire on September 24, 1923, and the cotton,
for the value of which recovery is here sought, was
burned. The plaintiffs held bills of lading of the rail-
road company for the cotton in controversy. There was
proof to establish the value of the cotton as claimed by
the plaintiffs, at least to the extent of the decree as rend-
ered in their favor. The cotton was insured by the plain-
tiffs, the amount of the loss was adjusted, and the insur-
ance companies advanced to the plaintiffs the amount of
the loss as adjusted, as a loan repayable to the extent

of the net recovery that the plaintiffs might have of any carrier, bailee, or others, on account of the loss, and the amount thus recovered, if any, was pledged to the insurance companies for the loan; and it was agreed between the plaintiffs and the insurance companies that the plaintiffs would prosecute an action with due diligence and at their own cost against the carrier, bailee, or others, to recover the amount of the damage from the loss by fire.

The insurance policies carried by the plaintiffs contained the following clause: "And warranted by the assured free from any liability for merchandise in the possession of any carrier or other bailee, who may be liable for any loss or damage thereto; and for merchandise shipped under a bill of lading containing a stipulation that the carrier may have the benefit of any insurance thereon; and that any insurance granted herein shall not cover where any carrier or other bailee has insurance (whether prior or subsequent in date to this policy) which would attach if this policy had not been issued; and that any insurance against fire granted herein shall not cover where the assured has fire insurance (whether prior or subsequent in date to this policy) which would attach if this policy had not been issued."

The bill of lading contained among others the following clause: "'That any carrier or party liable on account of loss or damage to any of said property shall have the full benefit of any insurance that may have been effected upon or account of said property, so far as this shall not avoid the policies or contracts of insurance."

There was in evidence a policy issued by the Royal Insurance Company, Ltd., of Liverpool, to the railroad company, insuring the latter company against all direct loss or damage by fire from the first of September, 1923, to September 1, 1924, and in the policy the insurance company agreed to indemnify the railroad company for payments on account of the latter's liability as a common carrier or warehouseman for loss or damage by fire to cotton in bales for which bills of lading had been issued, and which such cotton was being held in the warehouse of the

warehouse company at Mineral Springs, Arkansas. It was proved that the insurance companies paid to J. G. Sain, as trustee for the railroad company, the sum of $18,130, the amount of the loss as adjusted under the policies, which amount was deposited in the Planters' Bank & Trust Company in the name of J. G. Sain, as trustee, and is held by him subject to the decision in these actions. Sain, in the event of recovery against the railroad company, was to distribute the money *pro rata* among those who had made claims against the railroad company for loss of cotton in the fire amounting in the aggregate to $37,000. It was shown that there were about 450 bales of cotton in the warehouse at the time of the fire, and the warehouse company didn't have any watchman employed to look after the warehouse while the employees who worked there were away. The fire occurred about one o'clock on Monday morning; there had been no one in the warehouse since the Saturday evening before.

During the progress of the trial the railroad company tendered to the plaintiffs the warehouse receipts for the cotton in controversy and also the premiums, paid by the plaintiffs to the insurance companies, upon the policies insuring the cotton, which tenders were refused by the plaintiffs.

The above are substantially the facts upon which the court found in favor of the defendant warehouse company, against the plaintiffs, and entered a decree dismissing the complaints against that company for want of equity. The court also found in favor of the plaintiffs against the defendant railroad company, and entered a decree in favor of the plaintiff Newberger Cotton Company against the defendant railroad company in the sum of $11,672.28, with interest at six per cent. from November 1, 1923; and also entered two decrees in favor of the plaintiff Lesser-Goldman Cotton Company each in the sum of $2,863.60, with interest at six per cent. from November 1, 1923. The court found that the money in the hands of Sain was a trust fund belonging to the

plaintiffs and others, and entered an order directing the railroad company, or its attorney Sain, to pay into the registry of the court the money in his hands, or a sufficient amount thereof to satisfy the decree, and directing that, if the whole sum be deposited, the same should be distributed among all claimants similarly situated, as the *pro rata* of such claims could not then be adjudged. The court further directed that, if the money was not paid into the registry of the court within twenty days, and if the judgments were not satisfied within that time, the clerk of the court, as a commissioner appointed for that purpose, should proceed to sell the property of the railroad company, after giving twenty days' notice by publication in a newspaper having a general circulation in Howard County.

The plaintiff Newberger Cotton Company excepted to the finding of the court on the value of the cotton, and prayed and was granted an appeal. The defendant railroad company excepted to the findings and decree of the court against it, and prayed and was granted an appeal.

1. The appellant railroad company contends that the chancery court had no jurisdiction. Whether or not the chancery court had jurisdiction must be determined by the allegations of the complaints. The railroad company and the warehouse company were parties defendant to the actions, and, under the allegations of the complaints and the recitals of the receipts embodied therein, the warehouse company bound itself to deliver the cotton to the bearer of the receipts. It was alleged that these receipts at the time the fire occurred were in the possession of the railroad company, having been accepted by the railroad company in lieu of the cotton which the receipts represented, which constituted a delivery to the railroad company and an acceptance by it for shipment of the cotton which the receipts specified. The complaints alleged that the railroad company was liable to the plaintiffs, and that the warehouse company was liable to the holder of the receipts because the latter company was, under the terms of its receipts, an insurer, and

because the warehouse company was negligent in not having a watchman to prevent the fire which caused the destruction of the cotton. There were further allegations in the complaints to the effect that the railroad company and the warehouse company had effected insurance on the cotton in controversy to indemnify them against loss of the cotton delivered to them, and that the sum of $20,000 had been collected on these policies, which amount the railroad company had refused to pay the owners of the cotton. There was prayer for judgment against the railroad company and, in the alternative, that the plaintiffs be subrogated to the rights of the railroad company as holder of the receipts against the warehouse company, and "for all proper and equitable relief."

The complaints thus stated facts which, if true, entitled the appellees (plaintiffs below) to recover against the appellant railroad company (defendant below), or, if not against the railroad company, then facts were stated which entitled the appellees as the owners of the cotton to be subrogated to the rights of the railroad company, the holder of the warehouse receipts, as against the warehouse company, under the terms of its receipts, or under the allegations of negligence in causing the loss of the cotton by fire. Under the allegations of the complaints the doctrine of subrogation was properly invoked, as well as the power of a court of chancery to make proper orders for the preservation of the insurance funds in the hands of the trustee Sain, in order to conserve the rights of the parties before the court who might have an interest in such funds. It is clear, under the allegations of the complaints, that only a court of chancery could give present, complete and adequate relief to all the parties whose rights were involved in the litigation, without subjecting them to a multiplicity of suits. The facts set forth in the complaints therefore show three distinct grounds of equity jurisdiction; first, to prevent a multiplicity of suits, and to give plaintiffs an adequate remedy (*Redbud Realty Co.* v. *South,* 153 Ark. 381; *Little River Levee District* v. *Thomas,* 154 Ark. 328) ; second, to give the plain

tiffs the benefit of the equitable doctrine of subrogation
(*Wilson* v. *White,* 82 Ark. 407; *Southern Cotton Oil Co.*
v. *Napoleon Hill Cotton Co.,* 180 Ark. 555; *Cowling* v.
*Britt,* 114 Ark. 176); and, third, the proper distribution
of the funds held in trust by J. G. Sain for the benefit
of those entitled thereto. (*Symmers* v. *Carrol,* 207 N.
Y. 632).

2. The trial court found "that the delivery shown
by the evidence in this case was sufficient to, and did,
create the relation of shipper and carrier from the time
the bills of lading were issued and delivered to the ship-
per." This finding of the trial court was bottomed upon
a recital of facts which the court set forth at length in
its decree, and which we have already summarized above.
It could serve no useful purpose and would unduly
extend this opinion to reiterate and argue at length these
facts. Our conclusion on this branch of the case is the
same as that of the trial court. Certainly it cannot be
said that its finding is clearly against a preponderance
of the evidence. The facts show that the appellees had
done all in their power, and all that they were required
to do, to deliver the cotton in controversy to the appel-
lant railroad company for shipment. They had fully
complied with the custom established by the railroad com-
pany itself for the delivery to, and the acceptance by, it
of goods for shipment. While the cotton was delivered
to the railroad company in the warehouse of the ware-
house company, this was the place which the railroad
company had adopted as the place for the delivery to,
and acceptance by, it of cotton to be shipped over its
railroad. The railroad company accepted the warehouse
receipts turned over to it by the agents of the appellees
as the owners of the cotton, in lieu of the cotton itself.
This it did because it had adopted the warehouse of the
warehouse company as the place where it would receive
the cotton, and from which it would ship the same. A
preponderance of the testimony shows that, when the
appellees' agents at Mineral Springs delivered the ware-
house receipts to the agent of the railroad company and

took bills of lading evidencing the contract of the rail-
road company for the shipment of the cotton, nothing fur-
ther remained for these agents to do. So far as they were
concerned, the cotton was then delivered to the railroad
company for immediate shipment. It then became the
duty of the carrier to do whatever else was necessary to
put the cotton *in transitu* for its destination under the
contract of shipment evidenced by the bills of lading. The
contractual obligation of the railroad company as a com-
mon carrier had then begun, and its liability as such
for loss of the cotton was complete.

The facts of this record, as found by the trial court
and by us, bring the case clearly within the doctrine that
was announced by this court in *Railway Company* v. *Mur-
phy,* 60 Ark. 338, where it is said: "When the shipper
surrenders the entire custody of his goods to the carrier
for immediate transportation, and the carrier so accepts
them, *eo instanti* the liability of the common carrier com-
mences. When this occurs, the delivery is complete, and
it matters not how long, or for what cause, the carrier
may delay putting the goods *in transitu;* if a loss is sus-
tained, not occasioned by the act of God or the public
enemy, the carrier is responsible. But, on the contrary,
as there is no divided duty of safe-keeping, and no appor-
tionment, in the event of a loss, between the owner and
the carrier, the surrender of control over the goods by
the shipper must be such as to give the carrier the
unqualified right to put at once *in itinere,* and the carrier
must have received them for that purpose." See also
*Pine Bluff & Arkansas River Ry. Co.* v. *McKenzie,* 75 Ark.
100; *St. L. I. M. & S. Ry. Co.* v. *State,* 84 Ark. 154; *St. L.
I. M. & S. Ry. Co.* v. *Ozier,* 86 Ark. 182; *Bogart & Co.* v.
*Wade,* 132 Ark. 49; Hutchinson on Carriers, §§ 113 and
119; 4 Elliott on Railroads, § 2116; 4 R. C. L., chapter
on Carriers, §§ 167 to 170 inclusive.

It is contended by counsel of the appellant that the
above cases of our own court, cited by counsel for the
appellees, are not in point because of a difference in the
facts of those cases and the facts of the cases at bar.

But we do not find that the difference in the facts of those cases from the facts of this case is sufficient to make any difference in the application of the doctrine announced in those cases. As we find the facts of this record, the doctrine of the above cases is as applicable here as to the facts of those cases.

The liability of the railroad company in this case is not predicated upon the fact that it issued a bill of lading contrary to the provisions of § 790 of C. & M. Digest, forbidding railroads as common carriers to issue bills of lading unless the merchandise or property specified in the bills of lading shall be at the time of the issuance of such bills actually on board their cars. It is the duty of common carriers under our statute, § 877, C. & M. Digest, "to receive, load, unload, transport, store and deliver to the consignee thereof any and all property offered for shipment," and the liability as a common carrier attaches when goods are delivered to, and accepted by, it for shipment, regardless of whether it has delivered a bill of lading therefor or not. But, in view of the statute, where bills of lading have been delivered contrary to the statute, such fact may be considered, in connection with all the other evidence, in determining whether the relation of shipper and carrier exists. The facts here justify the conclusion that the railroad company did not issue its bill of lading until the cotton had been delivered to, and received by, it for shipment.

3. The undisputed testimony shows that the railroad company was carrying insurance in the sum of $20,000 to indemnify it against any loss it might sustain as a bailee or common carrier for loss or damage by fire of cotton in bales, for which it had issued bills of lading. After the loss occurred the insurance companies, not denying their liability on the policies, paid over the amounts to J. G. Sain, the attorney for the railroad company. The railroad company, denying that it was liable to the owners of the cotton for the loss sustained by them by reason of the fire, refused to make payments to the owners, and refused to accept the insurance money; but

the same was deposited by its attorney in the Planters' Bank & Trust Company, and it is conceded by the appellant that the same is held in trust for the benefit of those who may establish their claims against it for the loss of the cotton. Therefore, it was proper for the court, in these circumstances, to direct Sain, the trustee, to pay the money held in trust by him into the registry of the court for the benefit of those who might be entitled thereto. It will be noted that the court did not order the money to be paid over to the railroad company, but that the railroad company, if it satisfied the judgments rendered against it herein, would be entitled to its *pro rata* part of the trust fund to indemnify it for the satisfaction of these judgments. This order was certainly for the protection, and inured to the benefit, of the railroad company, and it is not in an attitude to complain of the ruling of the court directing that the insurance money be paid into the registry of the court. Other parties interested therein are not complaining, and they are fully protected by the court's order, although not nominally parties to this action. The court's order did not make final disposition and distribution of the funds, but the effect of it is to preserve them for the benefit of those who might establish claims against the railroad company, and for the benefit of the railroad company as well.

4. The bills of lading under which the cotton was delivered to, and accepted by, the appellant for shipment provided that "any carrier or party liable on account of loss or damage to any of said property shall have full benefit of any insurance that may have been effected upon or on account of, said property so far as this shall not avoid the policies or contracts of insurance." In the policies or contracts of insurance between the appellees and the insurance companies, it is provided that the insurance companies shall not be liable, among other things, "for merchandise shipped under a bill of lading containing a stipulation that the carrier may have the benefit of any insurance thereon; and that any insurance granted herein shall not cover where any carrier or other

bailee has insurance (whether prior or subsequent to date of this policy) which would attach if this policy had not been issued.''

Construing the provisions of the contract of affreightment as contained in the bill of lading above in connection with the provisions of the contract of insurance above, it is clear that the appellant carrier was not entitled to be subrogated to the rights of the appellees, the assured under the policies, for the loss sustained by the latter. This, for the reason that the appellant carrier, under the express terms of its contract, was not entitled to any benefit of insurance effected by appellees, the shippers, if the contract of shipment had the effect to avoid the policies or contracts of insurance. By the provisions of the contract of insurance above set out there were three existing conditions by which the policies were avoided; first, the property insured at the time of its loss by fire was in the possession of the appellant carrier, as we have seen, and if not, certainly it was in the possession of the warehouseman as bailee, one or the other of which was certainly liable for the loss; second, the bill of lading under which the cotton was received for shipment contained a stipulation that the carrier should have the benefit of the insurance thereon; and third, it appears that the appellant carrier did have insurance on the cotton in controversy at the time of its loss by fire, for which loss the companies insuring the cotton for appellant conceded liability. We conclude therefore that the appellant, under the terms of its contract of shipment with the appellees, was not entitled to any benefit of the insurance policies effected by the appellees on the cotton in controversy. See Pa. Ry. Co. v. Maheim Ins. Co., 56 Fed. 301; Southard v. Minn. etc., Ry. Co., 60 Minn. 382; Ins. Co. of N. A. v. Easton, 73 Tex. 167, 3. L. R. A. 424, 11 S. W. 180; Kally & Co. v. Morton, 141 N. Y. Sup. 374, 216 N. Y. 655, 110 N. E. 1043; see per contra Adams v. Hartford Fire Ins. Co., 24 A. L. R. 182.

But it is insisted by learned counsel for appellant that the above printed clauses in the original insurance

policies are superseded by typewritten riders attached thereto, which provided in substance that the insurance is extended to cover cotton or linters consigned to the assured, and attaching only from the time of the issue of a railroad bill of lading therefor, or in case of cotton consigned to the assured and delivered at the compress or warehouse when the assured had received compress or warehouse receipts therefor. But there is no conflict between the provisions of these typewritten riders and the printed clauses above set forth. They cover different hazards, the original policies covering the cotton owned by the appellees, while the riders covered cotton consigned to them, so that by the original clauses in the policies and the riders not only the cotton which the appellees owned themselves, but also all cotton which was consigned to them, was brought within the terms of the policies.

5. It is contended by the appellant that the insurance companies have paid to the appellees the amount of their loss, and that those companies are the real parties in interest here, and that the appellees have no right to maintain this action for the benefit of the insurance companies. The decided weight of authority is against this contention. Although it is a question of first impression in this State, the validity of such loan agreements as that set forth in the complaints and established by the testimony of the appellees under the bills of lading and policies of insurance, has been thoroughly established in other jurisdictions, and by a decided weight of authority. We deem it unnecessary to enter upon a discussion of the matter ourselves for the reason that precisely similar agreements have been considered in exhaustive opinions to the force of which we could not hope to add, and we therefore find it only necessary to refer to these cases with the reasoning and conclusions of which we are fully satisfied.

In *Luckenbach* v. *W. J. McCahan Sugar Refining Co.,* 248 U. S. 139, the facts are similar to those of the case at bar, and the holdings of the court

bottomed on such facts are succinctly stated in the sylla-
bus as follows: "Where the bills of lading stipulated
that the carrier should have the benefit of any insurance
that might be effected by the shipper, but the shipper's
policies provided that the insurers should not be liable
for merchandise shipped under bills containing such stip-
ulations, or in the possession of any carrier who might be
liable for its loss or damage, *held,* that an arrangement
between the insurers and the shipper, whereby the former
loaned to the latter the amount of a loss caused by the
carrier's negligence, to be repaid only in so far as the
shipper recovered from the carrier, otherwise to operate
in effect as absolute payment under the policies, and
whereby, as security, the shipper pledged such prospec-
tive recovery and the bills of lading, and agreed to prose-
cute suit against the carrier at the expense and under
the exclusive direction and control of the insurers,—was
a lawful arrangement; that the loan was not a payment
of the insurance, and the carrier was not entitled to the
benefit of it, and that a libel brought in the shipper's
name, for the benefit of the insurers, pursuant to the
agreement, could be maintained against the carrier and
the ship." See also *Southard* v. *Minn. etc. Ry. Co.,*
60 Minn. 382, 62 N. W. 442, and other cases cited in appel-
lees' brief.*

6. It is contended that the appellee, Lesser-Gold-
man Cotton Company, cannot maintain this action for the
benefit of the Atlantic Mutual Insurance Company for
the reason that the latter company has not complied with
the Arkansas law authorizing it to do business in this
State. Sections 1825-1932 inclusive, C. & M. Digest.
These are actions by the Lesser-Goldman Cotton Com-

---

*See cases cited in appellees' brief: *The Turret Crown,* 282 Fed.
354; *Leland* v. *Hornblower,* 255 Fed. 289; *Bradley* v. *Lehigh Valley
R. Co.,* 153 Fed. 350; *Yazoo Railroad* v. *Blim,* 86 So. 805; *Lee* v. *Bar-
rett,* 144 N. Y. Supp. 941; *Gulf, C. & S. F. R. Co.* v. *Zimmerman,*
81 Tex. 605; *Penn. R. Co.* v. *Burr,* 65 C. C. A. 331; *Kalle & Co.*
v. *Martin,* 141 N. Y. Supp. 374. (Rep.).

pany, and not by the Atlantic Mutual Insurance Company. There is nothing in the statutes, *supra*, prohibiting this character of action.

7. The appellant contends that the court erred in the amount of its decree in favor of the Newberger Cotton Company. The court found that the value of the cotton belonging to the appellee Newberger Cotton Company at the time it was burned was $11,672.28. The appellant contends that that price is excessive, and the appellee Newberger Cotton Company appeals from the decree fixing this as the amount of its loss, and contends that the amount is too small; that the lowest amount that the court should have found under the evidence was $12.875.80, and therefore it asked that it have judgment here for that sum, instead of the amount fixed by the court. There is no controversy as to the price of the cotton belonging to the appellee Lesser-Goldman Cotton Company. The value of that cotton as found by the trial court is not questioned. The value of the cotton belonging to the appellee Newberger Cotton Company at the time of its loss is purely a question of fact, and it would serve no useful purpose to set out and discuss the testimony bearing upon this issue. We have examined the same and have reached the conclusion that, when all the competent testimony is considered, the finding of the court as to the value of the Newberger cotton is correct; certainly the finding is not clearly against a preponderance of the evidence.

The decrees are free from error, and they are therefore affirmed.