## OMAHA HARDWOOD LUMBER CO. v. J. H. PHIPPS LUMBER CO.

## J. H. PHIPPS LUMBER CO. v. OMAHA HARDWOOD LUMBER CO.

### Nos. 12254, 12255.

Circuit Court of Appeals, Eighth Circuit.

April 9, 1943.

Rehearing Denied June 1, 1943.

---

4

Yale C. Holland, of Omaha, Neb. (J. A. C. Kennedy and George L. DeLacy, both of Omaha, Neb., and G. Byron Dobbs, of Fort Smith, Ark., on the brief), for Omaha Hardwood Lumber Co.

Kenneth Teasdale, of St. Louis, Mo. (Bernal Seamster, of Fayetteville, Ark., on the brief), for J. H. Phipps Lumber Co.

Before SANBORN, JOHNSEN, and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

Phipps Lumber Company, an Arkansas corporation, sued to cancel a written contract for the purchase of a wood manufacturing plant, located at Little Rock, Arkansas, from Omaha Hardwood Lumber Company, a Nebraska corporation. The purchase price was $15,000, which was to be paid by deductions of ten per cent from the invoices on such lumber and wood products as Omaha Hardwood thereafter ordered from Phipps Lumber. The trial court decreed cancellation, on the ground that Phipps Lumber's secretary and general manager had executed the contract without authority or knowledge of its board of directors and outside the scope, either actual or apparent, of the customary and reasonably necessary duties of a general manager of the corporation's regular business.

Omaha Hardwood has appealed from the decree of cancellation, contending that the court erred in denying its motion to quash the service of summons, and also that the findings and conclusions on the merits are erroneous. Phipps Lumber has cross-appealed from the court's allowance, in favor of Omaha Hardwood, of a wholesaler's discount of five per cent, upon some lumber, for which recovery also was sought in the action, purchased prior to the suit and on which payment had been withheld.

We find no error in the denial of Omaha Hardwood's motion to quash the service of summons.

After the contract involved was made, Omaha Hardwood had filed a certificate of withdrawal from Arkansas and ceased to

do business in the state. This action was instituted more than four years after the withdrawal, and summons was served upon the State Auditor, under section 2250, Pope's Digest Ark., which provides: "In all suits hereafter brought in any of the courts of this State against any foreign corporation upon any cause of action, whether in contract or tort, or where any liability on the part of a foreign corporation shall accrue, and suits shall be brought thereon in any courts of this State having jurisdiction of the subject matter, and if such foreign corporation has not designated an agent in this State upon whom process may be served, or has no agent within this State upon whom service of process may be had so as to authorize a personal judgment, service of summons or other process may be had upon the Auditor of State, and such service shall be sufficient to give jurisdiction to any court of this State of the foreign corporation so served, whether such service shall be issued from any court sitting in the township or county where the Auditor is served or elsewhere in this State. It shall be the duty of the Auditor of State, immediately upon receiving any such summons or other process, to transmit the same to the foreign corporation so sued, by registered mail, at its home office or other place where service of process upon such foreign corporation may be had." The State Auditor had duly transmitted the summons served upon him to Omaha Hardwood, in accordance with the requirement of the statute.

Under the construction of this statute made by the Arkansas courts, service thereunder upon a foreign corporation that has been doing business in the state is valid, even after the corporation's withdrawal from the state, on any cause of action in favor of an Arkansas citizen arising out of the corporation's previous transaction of business in the state. Sydeman Bros., Inc. v. Wofford, 185 Ark. 775, 49 S.W.2d 363. See, also, Davis v. Kansas & Texas Coal Co., C. C. W.D. Ark., 129 F. 149; Collier v. Mutual Reserve Fund Life Ass'n, C. C. W.D. Ark., 119 F. 617. The fact that the present contract was made in Nebraska and not in Arkansas would not necessarily preclude the application of the statute, since the statute has been construed as applying to "any liability arising from or growing out of contracts made *or business done in the state or necessarily incident thereto*". (Italics added.) National Liberty Insurance Company v. Trattner, 173 Ark. 480, 292 S.W. 677, 680. See, also, Ark. Const. art. 12, § 11. A contract between a foreign corporation doing business in the state and an Arkansas citizen, no matter where made, which is intended to be performed in part within that state while the corporation is authorized to do business there, may, we think, in a sufficient sense, give rise to a "liability arising from or growing out of * * * business done in the state or necessarily incident thereto", to be within the operation of the statute. As the trial judge expressed it in his memorandum opinion, "Regardless of where the physical execution of the contract occurred, the obligations and liabilities upon which this cause is bottomed grew out of and occurred by reason of the defendant's doing business in the State of Arkansas."

The contract relationship contemplated that Omaha Hardwood should turn over to Phipps Lumber, in Arkansas, its manufacturing plant and activity in that state. Whether the disposition of the plant was to be a mere incident in the continued conduct of business within the state, or whether it was intended only to facilitate the corporation's subsequent withdrawal from the state, is, under the liberal interpretation made of the statute by the Arkansas courts in favor of its citizens, in our opinion immaterial, since, in either situation, part of the necessary performance, at least, was to involve a direct exercise of the corporation's then-authorized powers within the state and the cause of action could properly be said to be related to and to grow out of the transaction of business which the corporation was licensed to conduct therein.

The argument that the statute is unconstitutional may be disposed of by the statement that the grounds on which a corresponding Arkansas statute was previously declared unconstitutional in Cella Commission Co. v. Bohlinger, 8 Cir., 147 F. 419, 78 C.C.A. 467, 8 L.R.A.,N.S., 537, have been cured in the present statute, by the legislative requirement that the State Auditor must transmit the summons served upon him to the corporation, and by the declaration of the Arkansas Supreme Court that the statute has no application to a foreign corporation engaged merely in doing an interstate and not a local business See Vaccinol Products Corp. v. State, 203 Ark. 302, 156 S.W.2d 250, 251; H. J. Heinz Co. v. Duke, 196 Ark. 180, 116 S.W.2d 1039,

1041; Graysonia, N. & A. R. Co. v. Newberger Cotton Co., 170 Ark. 1039, 282 S.W. 975, 982.

The validity of the service of summons has been attacked only as to the action as an entirety, and not separately as to the portion of the recovery sought for materials purchased by Omaha Hardwood subsequent to its withdrawal from the state. Whether these purchases, treated as a separate cause of action, would otherwise have been within the operation of the process statute, we are not asked to decide. On the issues and contentions presented to it, the trial court properly held the service of summons valid.

■ As to the contentions made on the merits, the record in our opinion amply supports the findings of the trial court that the general manager of Phipps Lumber had no actual authority from the corporation to make the contract; that his act in executing such a contract was "not usual, customary and reasonably necessary in the conduct of the ordinary business of plaintiff", so as to be impliedly within his general manager's powers; that the corporation had not held him out as possessing any such apparent authority; and that there was nothing in the previous business relationships between the two corporations that would reasonably justify Omaha Hardwood in assuming that he possessed such authority.

■■ The general manager of a business, unless otherwise agreed, has authority to make such contracts only as are incidental to the business, are usually made in it, or are reasonably necessary in directing or conducting its ordinary operations. See Restatement, Agency, § 73; 2 Fletcher Cyclopedia Corporations, Permanent Edition, § 667; United States Bedding Co. v. Andre, 105 Ark. 111, 150 S.W. 413, 414, 41 L.R.A.,N.S., 1019, Ann.Cas. 1914D, 800; Dale v. Donaldson Lumber Co., 48 Ark. 188, 2 S.W. 703, 3 Am.St.Rep. 224; Carroll-Cross Coal Co. v. Abrams Creek Coal & Coke Co., 83 W.Va. 205, 98 S.E. 148; Spann v. Commercial Standard Ins. Co. of Dallas, Tex., 8 Cir., 82 F.2d 593, 597. Purchasing the plant and site of a competitor, in order to eliminate it from the producing field, or for other business policy purpose, is not ordinarily within the implied powers of a general manager of a manufacturing corporation. Compare Restatement, Agency, § 73, Comment b.

■ Omaha Hardwood argues, however, that the contract should have been held to be within the implied authority of the general manager, on the ground that, under the ten per cent invoice deduction provision, the transaction was simply equivalent to a sale of $150,000 worth of Phipps Lumber's products to Omaha Hardwood, and that the transfer of the Little Rock plant was merely a payment incident. But this construction seems to us strained and tenuous, and it ignores the express recitations of contractual purpose in the instrument and the effect of its plant-price acceleration provision. Furthermore, even if the trial court had chosen to adopt such a construction, it would still have been entitled to find that, since Omaha Hardwood had not agreed to order any fixed quantity of products within any particular period and the contract manifestly would be one of indefinite duration, and since the transaction was designed to effect the immediate taking over of the Little Rock plant by Phipps Lumber, subject to a right of acceleration for the fixed value, upon a contingency which was not wholly within the control of that corporation and which might cause the plant price to become payable to Omaha Hardwood without the purchase of $150,000 worth of products, the contract, treated as a sale of Phipps Lumber's products, was so unusual and extraordinary as not to be within the prima facie authority of the general manager, under the principles stated above. Certainly, on the facts in the record, if the transaction were to be regarded fundamentally as a sale of Phipps Lumber's products, it could not be declared here, as Omaha Hardwood would have us do, that such an agreement was so regular a sales transaction as to be within the implied or apparent authority of the general manager, as a matter of law. That question, if Omaha Hardwood's theory of construction had been adopted, would at most, in the present situation, have constituted one of fact on the evidence. See J. H. Hamlen & Son, Inc., v. Varnell, 200 Ark. 238, 139 S.W.2d 1, 3; Fireman's Fund Ins. Co. v. Leftwich, 192 Ark. 159, 90 S.W.2d 497, 499; C. I. Stafford & Sons v. Simon, 198 Ark. 624, 129 S.W.2d 942; Bradley Advertising v. Froug Stores, 193 Ark. 639, 101 S.W.2d 789, 791.

■ The contention that Phipps Lumber should be held to have ratified the contract may be disposed of with the comment that

8

this question too was one of fact on the evidence, and that there is sufficient support in the record for the finding of the trial court. See Merchants' & Farmers' Bank v. Harris Lumber Co., 103 Ark. 283, 146 S.W. 508, Ann.Cas. 1914B, 713; Coffin v. Planters' Cotton Co., 124 Ark. 360, 187 S.W. 309; Arkansas Valley Bank v. Kelley, 176 Ark. 387, 3 S.W.2d 53, 58 A.L.R. 808; Bank of Hoxie v. Woollen, 181 Ark. 843, 28 S.W.2d 61; City National Bank v. Riggs, 188 Ark. 420, 66 S.W.2d 293; 2 Fletcher Cyclopedia Corporations, Permanent Edition, 775, § 752.

There remains only the question whether, even though the contract was not within the scope of the actual or apparent authority of the general manager and was unratified by the corporation, the situation which has come to exist as a result of the transaction, in the four years elapsing before the corporation learned the facts and instituted the present action, is one which is capable of being adequately undone and adjusted through cancellation to satisfy the principles of equitable justice.

The general principle that cancellation will not be granted unless the other party can be placed in statu quo must, of necessity, be given a practical and somewhat flexible application to the circumstances of each particular case. The degree to which a literal restoration of the status quo will be required as a condition of cancellation depends largely upon the nature of the subject matter, the circumstances of the transaction, the measure of the parties' respective legal and moral responsibility for the confronting situation, and the equitableness of the judicial result that it is possible to achieve. As it is commonly expressed, cancellation will be denied if the granting thereof will leave the plaintiff with any unconscionable advantage, or if the defendant cannot be substantially restored to his former position, under all the circumstances of the case. 9 Am.Jur. 384 and 386, §§ 39, 41. But, as with other equitable principles, the fundamental test necessarily is whether, on the whole situation, justice in the particular case will more nearly and practically be achieved by the granting or by the denial of cancellation. Dermott Land & Lumber Co. v. Walter A. Zelnicker Supply Co., 8 Cir., 271 F. 918; Stanford v. Smith, 163 Ark. 583, 260 S.W. 435.

The record here shows that after the contract was made, Omaha Hardwood turned over fully to Phipps Lumber its Little Rock plant; discontinued its manufacturing operations in Arkansas; withdrew from the state; ceased to be a competitor of Phipps Lumber in the local trade territory; and became a customer of Phipps Lumber for the products which it previously had manufactured. The evidence does not indicate whether, as a simple plant purchase, the contract would have constituted a good or bad deal for Phipps Lumber, nor, of course, is that fact controlling here. The general manager testified that his primary motive in making the contract was to acquire Omaha Hardwood as a customer for $150,000 worth of products, which was equivalent to one-half of the normal annual output of the Phipps Lumber factory.

For some reason, however, the general manager chose to conceal the transaction from the other officers and directors of Phipps Lumber. This was not particularly difficult, because these officers and directors were all members of a single family, who had control of the stock of the corporation but who gave only loose and negligible attention to its business affairs. The contract had never been set up as a liability on the corporation records, and the subsequent ten per cent invoice deductions in favor of Omaha Hardwood were made to appear on the books as ordinary trade discounts or allowances. The attention of the other officers and directors was therefore not challenged to the matter until late in 1937, when the cash position of the corporation made it necessary for the general manager to ask the other officers and directors to make arrangements for a temporary bank loan. This prompted them to go over all the corporation's accounts and to have a complete audit made of the books and records. The audit was completed during the summer of 1938, and for the first time they learned the facts as to the contract and as to the relationship which had come to exist between the two corporations. The general manager's connection with the corporation was promptly terminated and the contract was repudiated.

There is no direct evidence that Omaha Hardwood was aware of the concealment of the contract or that it knew that the transaction had not regularly been approved or ratified by the board of directors of Phipps Lumber; nor did the trial court make any finding that Omaha Hardwood had such knowledge or that it was guilty

of any bad faith or fraud in the matter. It is admitted that, when the contract was executed, Omaha Hardwood's officers were informed that the board of directors of Phipps Lumber had not at that time considered or approved the transaction. But that condition obtained also as to Omaha Hardwood, and, because of this mutual situation, it appears that a provision, which had been contained in the preliminary contract draft submitted by Omaha Hardwood's attorney, to the effect that the instrument was being executed by the officers of the two corporations "in accordance with the resolutions of their respective boards of directors", was purposely omitted from the final draft. Omaha Hardwood's officers, however, thereafter duly submitted the contract for approval by the board of directors of that corporation, and it may be that they assumed that the general manager of Phipps Lumber had done the same, although the evidence is silent on that point. It would perhaps not be unnatural for them to suppose—unless they were guilty of bad faith, collusion or fraud in the situation, of which there is no finding— that a contract, upon which the corporation had seemingly been acting through a four-year period, must have been duly approved or ratified by its board of directors.

If there was no bad faith, collusion or other fraud on the part of the officers of Omaha Hardwood, that corporation can hardly be treated as occupying a lower equitable position than Phipps Lumber, as to the consequences of the general manager's subsequent fraud upon his principal, in their relation to the previous status quo. While the transaction might basically have been subject to cancellation, because of the general manager's lack of authority to make the contract, the latter's subsequent actions under it, though improper in his obligation to his principal, might nevertheless so change the situation with respect to the subject matter that it would be inequitable to grant cancellation, if Omaha Hardwood was an innocent party. The fairness of the result to be achieved toward Omaha Hardwood in such a situation would have to take into account that the consequences of the general manager's subsequent breach of duty, in concealing the contract but in dealing with its subject matter for the benefit of Phipps Lumber, was chargeable, not to his original lack of authority to make the contract, but to the position and relationship which he was permitted to occupy to his principal in the general conduct of the business.

The situation here is such, it seems to us, that, if Omaha Hardwood exercised good faith in the transaction, and did not collude with the general manager of Phipps Lumber, and had no reason to assume other than that the general manager had informed the board of directors of the corporation of the facts of the transaction, the trial court's decree is inequitable.

The record shows that, after the contract was made and the Little Rock plant was turned over, the general manager of Phipps Lumber discontinued it as a going concern. He stripped the plant of its machinery and equipment, for the benefit of Phipps Lumber, using a part thereof to set up a saw mill elsewhere, and installing the electric motors and some of the other machinery from time to time in the Phipps Lumber factory. Part of the other equipment he disposed of, and paid the proceeds into the treasury of Phipps Lumber. He then allowed the building structures and real estate to stand vacant and to become subject to the general depredations and deterioration of abandoned property.

The trial court's decree required Omaha Hardwood to take back the real estate and building shells, deteriorated by four years' vacancy and abandonment, and stripped of all its operative equipment, in lieu of what, at the time the transaction was made, was an operable and fully equipped manufacturing plant. Without any evidence on the part of Phipps Lumber that it was possible practicably to restore the plant to its former operating condition, or of what the cost of such restoration might be, the court simply made an allowance to Omaha Hardwood of the sum of $3,600 for the machinery and equipment, which was the value to which it had been depreciated on the books of the corporation for tax and reserve purposes, and which figure was furnished to the general manager at the time of the transaction. No attempt was made to show that this was its fair market value for separation or replacement purposes, nor to establish what the cost of replacement installation would be, while Omaha Hardwood, on the other hand, contended, and offered some general evidence to show, that it would cost from $13,000 to $15,000 to restore the property to the condition and value that existed at the time the contract was made.

We think, as we have indicated above, that, unless bad faith, collusion or other fraud existed on the part of Omaha Hardwood, the situation which had come to exist, as a result of the subsequent actions of the general manager of Phipps Lumber, must be regarded as having so radically affected the status quo position of Omaha Hardwood that it would be inequitable to decree cancellation. Since the trial court did not rest its treatment of the status quo situation upon any such justificatory finding, the decree cannot stand, but must be reversed.

Phipps Lumber has contended here, and presumably a similar contention was made in the trial court, that Omaha Hardwood has been guilty of bad faith and collusion in the transaction. The contention is not made a substantive basis for relief in the complaint, but the question is, of course, apart from this aspect, a proper field of inquiry, in its general relation to a status quo restoration. For this reason the cause will be remanded for further proceedings upon that question, on the present record and on such additional evidence as the parties may be in a position to offer in connection with the issue. Unless the evidence is such as to warrant a finding that Omaha Hardwood was guilty of such bad faith, collusion or other fraud in the matter that it knew or had reasonable grounds to believe that Phipps Lumber's general manager would conceal the transaction from the corporation and that the existing situation with respect to the Little Rock plant was therefore likely to result, cancellation and an attempted restoration of the status quo should be denied as a matter of equity.

Phipps Lumber has argued that it should be held that the contract here involved was void as a matter of public policy. If that were true, it might perhaps have a bearing upon the extent to which the court would be justified in going in considering the question of status quo restoration. But there is no merit in the contention. The argument centers upon the contract provision that Omaha Hardwood should have the right to accelerate any plant purchase-price balance that might remain, if Phipps Lumber's general manager terminated his position with the corporation or if his relationship otherwise ceased. It is said that this was an illegal attempt to perpetuate Phipps Lumber's general manager in his corporate position. We see nothing illegal or contrary to public policy in the contract provision. Omaha Hardwood's explanation was that, since the contract was intended to result in the purchase of a considerable quantity of Phipps Lumber's products, it did not want to take the risk of being obliged to purchase $150,000 worth of products, in order to obtain payment for the Little Rock plant, unless the products were continued up to the standard that then existed; that it had confidence in the operative skill and standards of the existing management, but that Phipps Lumber had previously had management that had been guilty of turning out inferior products; and that, if there should be any change in management with the possibility of such a recurrence, it wanted to be able to protect itself for the purchase price of the Little Rock plant, by acceleration of the balance due. The provision was in legal effect nothing more than an ordinary, protective, acceleration clause.

As to the cross-appeal of Phipps Lumber, from the allowance of a five per cent wholesaler's discount upon the lumber which Omaha Hardwood had purchased and not paid for, the record is somewhat confusing. If cancellation of the contract is denied, there is no reason to treat the transactions any differently than the other purchases made under it, so far as discounts or trade allowances are concerned. If the contract is cancelled and the orders are to be treated as general market purchases, there is sufficient in the evidence of one witness to support the trial court's action. Besides, if a right of cancellation exists, the requested findings of fact and conclusions of law filed on behalf of plaintiff, in such a situation, expressly recognize and make provision for the allowance of such a discount. A party can hardly ask appellate relief from matters in a judgment which were included in his own requested findings and conclusions, without some satisfactory showing of excusable mistake, which he has first duly presented to the trial court. Omaha Hardwood admits that there is an excess of $8.25 in the trial court's allowance, which can be duly corrected, if the contract is subsequently cancelled and the five per cent discount allowance is accordingly permitted to stand.

The decree of the trial court is reversed, as above indicated, and the cause is remanded for further proceedings in accord with this opinion.