**ARKANSAS VALLEY FEED MILLS, INC., Plaintiff,**

v.

**FOX DE LUXE FOODS, INC., Defendant,**

**Harold Snyder, Third-Party Defendant.**

**Civ. A. No. 1392.**

United States District Court
W. D. Arkansas,
Fort Smith Division.
March 3, 1959.

Williams & Gardner, Russellville, Ark., for plaintiff and third-party defendant.

Crouch, Jones & Blair, Springdale, Ark., James L. Fox, Chicago, Ill., for defendant.

JOHN E. MILLER, Chief Judge.

The plaintiff filed its complaint on December 31, 1957, which is set out more fully in D.C., 163 F.Supp. 759. The complaint alleged in essence that on December 14, 1953, the plaintiff entered into a written contract with the defendant effective January 4, 1954, for a period of one year, under which the defendant agreed to purchase from the plaintiff 50,000 chickens each week. The plaintiff further alleged that the defendant defaulted in part until July 24, 1954, and thereafter wholly refused to perform any part of the contract.

On February 8, 1958, the defendant filed its answer in which it admitted the execution of the contract sued upon, but alleged that said contract was canceled by a written agreement dated August 2, 1954, signed by Harold Snyder, president of the plaintiff, Arkansas Valley Feed Mills, Inc., and alleged that the agreement was effective to cancel all obligations under the contract of December 14, 1953.

Following the filing of the deposition of Harold Snyder, president of the plaintiff corporation, the defendant on May 27, 1958, moved for a summary judgment, basing its motion upon the cancel-

lation agreement. On June 18, 1958, the plaintiff filed its response to the motion for summary judgment, and attached affidavits thereto. In its response the plaintiff alleged that the cancellation agreement was executed without consideration, and further that the consideration for that agreemnt, if any, had failed.

The plaintiff also alleged in its response to the motion for summary judgment that Harold Snyder, as president of the Arkansas Valley Feed Mills, Inc., had no authority to execute the cancellation agreement, and that said agreement was not ratified by the corporation.

On July 14 the court, after considering the pleadings, depositions, affidavits, and briefs of the parties, concluded that there was a genuine issue of fact as to the authority of Harold Snyder to execute the cancellation agreement or whether the plaintiff had ratified the alleged cancellation agreement. Accordingly the motion for summary judgment was denied. D.C., 163 F.Supp. 759.

On the same day the court advised the parties that in the interest of economy of time and money the case should be tried first upon the issue of the validity and effect of the cancellation agreement, and if the court concluded that the said agreement was executed without authority of the plaintiff and had not been ratified by plaintiff, an additional hearing would be held to determine the amount of damages to which the plaintiff was entitled, if any.

On December 13, 1958, the defendant moved for leave to amend its answer and to file a third-party complaint against Harold Snyder, president of the plaintiff corporation, as an individual. On December 15 the court granted the motion, and on the same day the defendant filed its amended answer and third-party complaint. In essence the third-party complaint alleged that if in fact Harold Snyder was without authority to execute the cancellation agreement, he had fraudulently and willfully induced the defendant by false representations to execute that agreement. Consequently, the third-party complaint prayed that in the event the plaintiff recovered a judgment against the defendant, that the defendant have judgment over against Harold Snyder.

The amended answer alleged that in fact Harold Snyder had authority to execute the cancellation agreement of August 2, 1954, but that, in any event, the plaintiff corporation was estopped from denying such authority because it had held out Harold Snyder as having authority to execute contracts in its behalf both to the public generally and specifically to the defendant. The defendant also alleged that the plaintiff corporation ratified the acts of Snyder in executing the cancellation agreement by accepting the adjustments set forth in that agreement.

The answer of the third-party defendant, Harold Snyder, denied that he represented to the defendant that he had authority to act on behalf of the Arkansas Valley Feed Mills, Inc.

On January 19 and 20, 1959, the case was tried to the court without a jury on the sole issue of whether the cancellation agreement of August 2, 1954, was valid and effective. At the conclusion of the trial, the case was submitted and taken under consideration, and the attorneys were directed to file briefs in support of their contentions. The briefs of the parties have been received and considered along with the pleadings, depositions, ore tenus testimony and all exhibits, and the court now makes and files its formal findings of fact and conclusions of law.

### Findings of Fact

#### 1.

The plaintiff is a corporation organized and existing under the laws of Arkansas with its principal place of business at Dardanelle, Arkansas. The defendant is a corporation organized under the laws of Illinois and authorized to do business in Arkansas, where it maintains a place of business at Dardanelle, Arkansas. This suit was filed on December 31, 1957, and the amount in controversy is in excess of $3,000.

## 2.

The plaintiff corporation, Arkansas Valley Feed Mills, Inc., was incorporated in 1946 by Harold Snyder, W. H. McClure and F. S. Meek. The corporation (hereinafter referred to as the Mills) was originally formed to operate a dehydrating plant, but later expanded its activities to include the manufacture of feed and the sale of chickens. In 1952 the Mills entered into a contract with the defendant, Fox De Luxe Foods, Inc. (hereinafter referred to as Fox), for the sale of chickens at a specified rate to Fox, and subsequently an amendatory contract between those parties was entered into for an increased rate of sale.

After these dealings between the parties, negotiations began in the latter part of 1953 for a similar contract which was to be operative during the calendar year of 1954. A written memorandum of this agreement was executed by the parties on October 8, 1953.[1]

A more formal contract embodying the terms set forth in the memorandum agreement was executed on December 14, 1953, and was to be operative beginning January 4, 1954, for a period of 52 consecutive weeks. The contract of December 14 is the contract sued upon herein by the plaintiff, and is hereinafter referred to as the marketing contract.[2]

## 3.

The parties embarked upon the performance of this contract, but after several months of operation thereunder a dispute arose as to some of the procedures being used by the defendant in its

1. "October 8, 1953
"Chicken Growing deal between Fox De-Luxe Foods, Inc. and Arkansas Valley Feed Mills, Inc.
"Time: January 4, 1954—for 52 weeks.
"General provisions of contract of June 27, 1952 to apply except:
  "1. Size of chickens to be 2.75 lbs. to 3.00 lbs.
  "2. Base price on live chickens—25½¢ to 27½¢—follow the market within this range—
    "(a) Below 25½¢—Payment to be N.W.Ark. market plus 50% of difference.
    "(b) Above 27½¢—Payment to be N.W.Ark. market minus 50% of difference.
  "3. Base adjustment—
  "Live paying price to vary 30¢ cwt. for every 10¢ (weighted average—corn ⅔—soybean meal ⅓). Price of nearest option to apply. Use weekly average.
  "Price to apply against following weeks purchases of chickens.
  "Base price of corn and soybean meal to be nearest option, average price w. e. October 9, 1953.
  "4. Number of Head—50,000 per week.
  "5. Penalty to be 1¢ per lb.
        "/s/ H. M. (?)
        "/s/ Robert J. Fox"
(Plaintiff's Exhibit No. 3)

2.         "Contract
"This Agreement made this 14th day of December 1953, by and between Fox De Luxe Foods, Inc., of Chicago, Illinois, hereinafter known as the 'Buyer', and Arkansas Valley Feed Mills, Inc., of Dardanelle, Arkansas, hereinafter known as the 'Seller', for and in consideration of the mutual agreements and covenants herein contained:
  "1. The Buyer agrees to buy from the Seller, and the Seller agrees to sell to the Buyer, fifty thousand (50,000) head of chickens each week, commencing January 4, 1954, for a period of fifty-two (52) consecutive weeks thereafter.
  "2. These chickens shall have an average weight of from 2.75 to 3.00 pounds per head, and shall be well fleshed, well feathered, healthy and No. 1, as based on current average quality.
  "3. The base price of said chickens shall be the Northwest Arkansas Mostly market price between the low of 25½¢ per pound and the high of 27½¢ per pound f.o.b. the farm. This base price shall be adjusted as follows:
  "For every 10¢ per cwt variation up or down, in the weighted average of corn and soy bean meal from October 9, 1953 nearest option quotation of the Chicago Board of Trade (using ⅔ for corn and ⅓ for soy bean meal) the said base price shall be adjusted 30¢ per cwt up or down in like manner.
  "The actual prices to be paid under the terms of this agreement as distinguished from the base price and the adjusted base price as above set out, shall be the adjusted base price if it is not lower than 25½¢ per pound nor higher than 27½¢ per pound. If, however, the adjusted base price is less than 25½¢ per pound or more than 27½¢ per pound, then the

performance. Paragraph 2 of the contract, as set forth in footnote No. 2, provided standards of weight and quality for the chickens to be bought by Fox, and paragraph 4 provided for a penalty to be imposed upon the seller in the event that the chickens furnished failed to meet the specifications of the contract.

In the spring of 1954 the defendant, apparently relying upon these provisions, began refusing to accept all of the 50,000 chickens per week which it was obligated under the contract to purchase, basing its refusal upon claims that the chickens furnished did not meet the standards prescribed by the contract. In order to determine whether the chickens were of the quality prescribed, Fox would grade the flocks of chickens offered and refuse or accept the chickens at contract prices as they met or failed to meet the standards of quality required under Fox' interpretation of the contract.

The plaintiff corporation contended that the quality was as prescribed in the contract and that, in any event, Fox was not entitled under the provisions of the contract to invoke the penalty clause. This contention was based upon the plaintiff's interpretation of the contract to the effect that the penalty could be effective against it only in the event it failed to offer 50,000 chickens each week of the required weight and that the penalty clause did not become operative because of a failure in quality of the chickens.

In July of 1954 Fox nevertheless invoked the penalty clause embodied in paragraph 4 of the marketing contract on the ground that the quality requirements of paragraph 2 were not complied with by the chickens which the plaintiff was offering.

The plaintiff was unable to persuade Fox to alter this procedure, and on August 2, 1954, in order to obtain a new contract or to cancel the existing marketing contract, the plaintiff's president and general manager, Harold Snyder, went to Chicago to meet with Fox representatives at their home office. The meeting was attended by Mr. Harold Williams, Mr. C. P. Dodd, and Mr. Roland N. Gergin, all representatives of the defendant Fox.

As the meeting progressed, it became apparent that Snyder and the Fox representatives could reach no general agreement as to the performance required by the marketing contract. Mr.

---

actual paying price shall be the adjusted base price plus or minus 50% of the difference between the Northwest Arkansas Mostly market and the adjusted base price.

"4. In the event that the Buyer fails to buy from the Seller, or the Seller fails to sell and have available for the Buyer said 50,000 head of chickens weekly, the one so failing shall pay to the other weekly, fifty per cent (50%) of the difference between the adjusted contract price and the weekly average price of the Mostly Market of live chickens as reported by the Federal State Market News Service, Fayetteville, Arkansas, for the Northwest Arkansas Area, plus 1¢ per pound on the difference in weight at the rate of 2.85 pounds per chicken on the number of chickens less than the required 50,000 purchased by the Buyer or furnished by the Seller. In the event that the Mostly price is not quoted, then an average is to be determined from the daily spread for the week in question. In figuring the total amount due under the terms of this paragraph, all chickens shall be conclusively presumed to weigh 2.85 pounds per head.

"5. It is further understood and agreed by and between the parties hereto that the Buyer shall have the right to pick-up up to twenty per cent (20%) of the required fifty-thousand (50,000) head of chickens in either the week ahead or the week following any given week without penalty.

"Witness our hands and seals this 14th day of December, 1953.

"Fox De Luxe Foods, Inc.,
"by: /s/ M. E. Fox Pres.
"Attest:

_____
Secretary

"Arkansas Valley Feed Mills, Inc.,
"by: /s/ Harold Snyder (Pres.)
"Attest:
"/s/ S. D. Mitchell
"Secretary                    "
(Plaintiff's Exhibit No. 4)

Gergin, a vice president of the defendant, then advised Snyder, as president and general manager of the plaintiff Mills, that it would be necessary to invoke the penalty provision of the marketing contract each week unless the chickens met with the quality requirements as interpreted by Fox. Snyder then suggested that the marketing contract be canceled with a view in mind that Fox would continue to purchase from the plaintiff Mills, but without a contractual agreement. In other words, if the marketing contract were to be canceled, Fox would not break off its relations with the plaintiff but would continue to purchase chickens on the open market to the extent that it might find desirable or necessary. A general agreement was reached between the Fox representatives and Harold Snyder that a cancellation should be made.

When this oral understanding had been reached, the meeting was adjourned to the office of Mr. Mike Fox, who is since deceased, but who at that time was president of the defendant, Fox De Luxe Foods, Inc. Mr. Fox agreed that the contract should be canceled but insisted that a cancellation agreement be signed before Snyder returned to Arkansas. Snyder agreed to sign the instrument which was prepared by Fox' attorneys at their office, where Snyder signed it on his way to the airport. The agreement in its entirety reads as follows:

"Cancellation Agreement
"Whereas, under date of December 14, 1953, a written agreement was entered into between Fox De Luxe Foods, Inc. of Chicago, Illinois, and Arkansas Valley Feed Mills, Inc. of Dardanelle, Arkansas, wherein and whereby said Fox De Luxe Foods, Inc. agreed to buy from Arkansas Valley Feed Mills, Inc. and the latter agreed to sell 50,000 head of chickens each week commencing January 4, 1954, for a period of fifty-two consecutive weeks thereafter on the stipulations, covenants and agreements in said agreement contained; and

"Whereas, the parties hereto have agreed to cancel said contract effective the day and date hereof.

"Now, Therefore, the parties hereto agree to and do hereby so cancel said agreement dated December 14, 1953, and in pursuance of this agreement of cancellation and of One Dollar in hand paid, one to the other, receipt whereof is hereby acknowledged, the said parties each do hereby release the other, their successors and assigns, from all sums of money, accounts, actions, claims and demands up to the date and execution of these presents, excepting an indebtedness now owed by said Arkansas Valley Feed Mills, Inc. to said Fox De Luxe Foods, Inc., by reason of adjustments of the paying prices specified in said agreement of December 14, 1953, in an amount to be ascertained and adjusted by the parties hereto. It is understood, however, that this cancellation shall be in full force and effect from the date hereof regardless of said adjustment.

"Witness our hands and seals the 2nd day of August, 1954.
"Fox De Luxe Foods, Inc.
"By /s/ R. N. Gergin V. Pres.
"Arkansas Valley Feed Mills, Inc.
"By /s/ Harold Snyder (Pres.)"

No other agreements, written or oral, were entered into between the parties during Snyder's visit to Chicago, and no conditions were imposed precedent to the operation of the cancellation agreement.

4.

Prior to 1946 Harold Snyder, who is now president and general manager of the plaintiff, had had no business experience, and up until the time of the organization of the plaintiff corporation had taught school. In 1946, however, Snyder, along with W. H. McClure and F. S. Meek, organized Arkansas Valley Feed Mills, Inc. At that time Snyder owned apparently 50 percent of the original stock although shortly thereafter additional stock was issued. Snyder was

made Secretary-Treasurer of the corporation. In 1948 the Mills began operating in the poultry and feed business.

In the intervening years, between Snyder's first venture into business in 1946 and the present time, he acquired interests in numerous other business enterprises. At least as early as 1950 or 1951 he was president of Dardanelle Industrial Foundation, and was still president of that organization at the time of trial. He is the largest stockholder in the Valley Poultry Company, a corporation which appears to be wholly unrelated to the plaintiff in this suit. That company is engaged in the processing of poultry, and can process birds at the rate of 125,000 for each 8-hour shift. Snyder also presently owns 40 percent of another concern, The Arkansas Valley Hatchery, and an interest in Arkansas Egg Company. He is now in the process of organizing a bank.

In 1952 Mr. Meek, who had been president of the plaintiff Mills, died, and Snyder became president. Mr. W. H. McClure at that time became Chairman of the Board of Directors, and Mr. S. D. Mitchell became secretary of the corporation and was also given the title general manager. During this period from 1952 to 1953, both Mitchell and Snyder devoted full time to the operation of the business of the Mills. However, although Mitchell was termed "general manager," he regarded Snyder as "his immediate superior" and the operations of the business were primarily directed by Snyder. No other stockholder engaged directly in the management of the business or devoted any significant time to its operation except that a secretarial and bookkeeping employee, Gretchen Goodier, was a nominal stockholder with a very small portion of the stock.

At no time during this period or afterward did the Board of Directors of the corporation meet regularly. Although the stockholders and employees of the plaintiff Mills testified that minutes of meetings of stockholders and the Board of Directors were regularly and meticulously kept by Mr. S. D. Mitchell as secretary, only several copies of such minutes and resolutions could be found. All of the papers reflecting corporate affairs from the incorporation in 1946 until the date of the trial in January 1959 comprise less than 25 documents, most of which are items of little or no significance, such as financial statements and insurance schedules of the corporation. None of the several minutes or resolutions reflect any limitation upon the authority of the president and general manager. The charter and bylaws of the corporation which were also introduced in evidence likewise impose no limitation upon that authority.

No verbal limitation upon the authority of Harold Snyder as president and general manager was imposed upon him by the Board of Directors of the corporation or by any stockholder except that upon one occasion the Board of Directors suggested to Snyder that he had allowed too many accounts receivable to accumulate. Even this suggestion, however, does not appear to be an explicit direction to Snyder as to any business policy.

Apparently because the Board of Directors of the corporation had confidence in Snyder's business ability, he was allowed a free hand in operating the corporation. He executed contracts and did all the major work of the corporation. He executed corporate warranty deeds, mortgages, and leases in the ordinary course of business without either the prior or subsequent approval of the Board of Directors. Although some resolutions apparently were passed by the Board to authorize the corporation to borrow substantial sums of money, those resolutions do not show on their face that they were made by the Board of Directors, and were signed only by Harold Snyder. It was customary for the Board to approve whatever action Snyder had taken since the preceding meeting, and never at any time was Snyder advised of any limitation upon him in the operation of the business.

5.

In 1951 Snyder, in the capacity of president of the Dardanelle Industrial Foundation, became acquainted with var-

ious officers and employees of the defendant Fox, and Fox agreed to and did construct a large poultry processing plant at Dardanelle. Beginning in 1952 the plaintiff Mills, through Snyder, negotiated and entered into several written contracts with Fox for the sale of chickens. The procedure followed in these arrangements involved negotiations by Snyder with representatives of Fox, and when an understanding had been reached, Snyder and Fox representatives would draw up memorandum agreements, which Snyder referred to as "layman's contracts." These memorandum agreements would be signed and Snyder would then apprise the Board of Directors of the Mills of the negotiation and the resulting contract. The memorandum agreements would be shown to the attorneys for the Mills who might suggest changes, and a more formal contract would then be prepared and signed by representatives of the parties. At no time did the plaintiff's Board of Directors advise Snyder that he was exceeding his authority in negotiating the contracts or in executing the memorandum agreements which embodied all of the essential terms which were later formalized. As set out above, the marketing contract sued upon here by the plaintiff was negotiated and prepared in the same manner. It was the third such contract between the parties, all of which had been negotiated and executed by Snyder.

### 6.

In January of 1954, during which time the marketing contract was in operation, the plaintiff Mills had expanded its business to produce feed for General Mills. It was decided at that time to create a separate corporation to handle the retail feed business which had previously been handled by the Mills with the end in mind that the Mills would manufacture the feed and sell it wholesale to various feed dealers. Prior to that time the plaintiff Mills had contracts with various growers of chickens, the purport of which apparently was a minimum guarantee for sales of chickens which were fed with the products of the Mills. It was contemplated that these and other obligations would be fulfilled by the new corporation which was duly formed under the name of the Valley Feed Company, Inc. (hereinafter referred to as the Feed Company). The Feed Company offices were set up and maintained in the same building and adjacent to those of the plaintiff, and upon its formation in January of 1954 Mr. S. D. Mitchell left the Mills and became manager of the Feed Company. At the same time, Miss Gretchen Goodier, an employee of the Mills, also went to work at the Feed Company. Although her employment was solely with the Feed Company, she continued to do a substantial amount of work for the Mills.

On April 20 and 21, 1954, the plaintiff Mills and the Feed Company entered into various contracts under which the Feed Company undertook to carry out various obligations of the Mills, including one in which the Feed Company obligated itself to carry out the marketing contract with the defendant Fox, and also any agreements the Mills had with the local growers.[3]

The marketing contract was thereafter wholly carried out through the Feed Company rather than through the plaintiff Mills. The Feed Company is not a

---

3. That contract in its entirety reads as follows:

"Dardanelle, Arkansas
"April 21, 1954
"Agreement

"This agreement is between the Arkansas Valley Feed Mill, Inc., and the Valley Feed Company, for carrying out terms of the Fox DeLuxe marketing contract.

"For the consideration of $1.00, the payment of which is hereby acknowleged, and other valuable considerations, the Valley Feed Company assumes responsibility for that part of the Fox DeLuxe contract with their local growers.

"Signed,
"/s/ Harold Snyder
"Arkansas Valley Feed Mills, Inc.
"/s/ S. D. Mitchell
"Valley Feed Company"

party to this suit. The contract between the Feed Company and the Mills whereby the Feed Company was to carry out the Fox Marketing contract was not signed by Fox, and apparently Fox treated the Feed Company as the agent of the Mills since it was notified to handle its business through the Feed Company rather than the Mills, and all accounts and payments were made by and to the Feed Company rather than the plaintiff.

The original incorporators of the Feed Company were Harold Snyder, Gretchen Goodier and S. D. Mitchell. Snyder's stock was thereafter transferred to his wife, but the minutes of the various stockholders' meetings of the Feed Company continued to reflect ownership in Harold Snyder of a large portion of the capital stock. Snyder also took an active part in the meetings of the Feed Company even though he was not at that time a stockholder. In addition, the Feed Company relied largely upon Snyder for advice in its operations, and the two companies operated in such a manner that they were virtually one business unit.

### 7.

After the formation of the Feed Company in January 1954, Snyder was designated general manager and continued as president of the plaintiff Mills. He carried on its business and negotiated its contracts. In this respect his duties and activities were not substantially different from the duties and activities he had carried on while S. D. Mitchell was the nominal manager of the Mills. In the spring of 1954 Snyder began acquiring substantial portions of the stock held by others in the plaintiff Mills. In purchasing such stock he paid substantially in excess of the original purchase price to the various stock owners. Some of the stock was purchased without immediate payment therefor, but the parties to the transactions considered Snyder to be the owner of the stock sold. By August 2, 1954, the date on which the cancellation agreement was executed by Snyder, he owned 710 shares of the 1,000 outstanding shares of capital stock in the plaintiff Mills. Subsequently he acquired additional shares.

The bylaws were never fully complied with, and at no time material herein were there seven Directors of the corporation as required by those bylaws. There is some confusion as to who may have been members of the Board of Directors on August 2. Answering an interrogatory, the plaintiff stated that the Board of Directors at such time was composed of Harold Snyder, Mrs. Lee Meek, Bob McClure, Charles Boyce, and Gretchen Goodier. However, Bob McClure testified that he was doubtful whether or not he was a member of the Board of Directors at that time, and the court finds that in any event he was not taking part in the management of the corporation or the activities of the Board on that date or thereafter. Donald Barger, a banker at Russellville, Arkansas, who eventually sold his stock to Snyder, was a member of the Board of Directors at that time and for at least one month thereafter.

There is no testimony revealing the activities of Mrs. Lee Meek on the Board. The other board members, Charles Boyce and Gretchen Goodier, were both employees of the plaintiff Mills. Boyce is a brother-in-law of Harold Snyder, and Gretchen Goodier is a minor stockholder employed in a secretarial capacity. The plaintiff's answer to the defendant's interrogatory showed Boyce as a member of the Board on August 2, 1954. Testimony revealed, however, that Boyce was not elected to that position until September 1954. The court finds under the answer to the defendant's interrogatory and the ore tenus testimony that the Board of Directors on August 2, 1954, was composed of Harold Snyder, Gretchen Goodier, Mrs. Lee Meek, and Donald Barger.

### 8.

As set out above, the dispute between the Mills and the defendant Fox was such that no resolution seemed feasible when Snyder went to Chicago to effect a compromise or a cancellation of the marketing contract. Prior to his trip

to Chicago, the Directors of the plaintiff Mills were informally advised of the proposed trip but no instructions or limitations upon Snyder's authority were imposed upon him by any of the Directors or stockholders. The Directors did not initiate the proposed trip to Chicago although they were aware that Snyder intended to engage in negotiations there, and they neither approved nor disapproved Snyder's action in making the trip.

After executing the cancellation agreement in Chicago, as outlined above, Snyder returned to Arkansas and advised the Board of Directors that the cancellation agreement had been signed, although he did not at that time exhibit a copy of the agreement. No action was taken by the Board of Directors at any time either approving or disapproving the cancellation.

The marketing contract had necessitated the use of "Weekly Adjustment Sheets" which were furnished by Fox to the Feed Company to indicate the adjustments over or under the "base price." After August 2, 1954, no Weekly Adjustment Sheets were furnished by Fox because the purchases by Fox were made on the open market and not under the contract. Neither the plaintiff Mills nor the Feed Company made any objection to this change of procedure, and for a short time after the execution of the cancellation agreement the plaintiff's business relations with Fox were satisfactory to the plaintiff. However, within a short time Fox again found the quality of the plaintiff's chickens to be unsatisfactory and refused to buy at top market prices. Instead Fox offered to buy and did buy according to the grade of chickens as determined by Fox. At this time Fox was not purchasing under the contract but on the open market, and the plaintiff had no obligation to sell. In other words, the dealings between the parties were simply such as they might agree upon for each flock of chickens.

The defendant sought to introduce testimony relating to market prices, the purpose of which was apparently to show that Snyder anticipated a rising market at the time of the cancellation agreement, but that, in fact, the market fell shortly thereafter so that the contract price would have been more profitable for the plaintiff than the sales on the open market. This testimony was excluded by the court, and although the defendant makes some argument predicated upon considerations of this kind, the court finds it unnecessary to make findings of fact thereon. The court does find, however, that the cancellation agreement was made in the ordinary course of the business of the plaintiff Mills, and was necessary and desirable to the operation thereof. Furthermore, it was executed by Harold Snyder, who was the only person representing the Mills with whom the defendant had previously dealt, and the cancellation was negotiated and executed in the same manner that previous contracts between the two companies had been handled.

The cancellation agreement provided for the adjustment of a debt owed by the plaintiff Mills to Fox. On October 1, 1954, Fox issued its check to the Feed Company in the sum of $2,545.90 in payment for certain purchases. All of its checks in payment for the purchases of chickens under the contract had been issued to the Feed Company rather than to the Mills since the Feed Company had taken over the retail business. The check issued by Fox represented the purchase price of certain flocks of chickens less the adjustment of $1,315.63 called for in the cancellation agreement. Accompanying this check was a voucher indicating the deduction and the reason therefor. The check was accepted and deposited by the Feed Company after a consultation with Snyder.

9.

From August 2, 1954, when the cancellation agreement was executed by Snyder until October 20, 1954, the plaintiff acquiesced in the action of defendant in treating the contract of December 14, 1953, as canceled. No action was taken by the plaintiff corporation or any

of its agents to enforce the original contract or to indicate any effort to rescind the cancellation agreement. On the latter date Snyder addressed the following letter to Mr. Earl Wise, manager of the defendant's plant at Dardanelle, Arkansas:

"Dear Mr. Wise:
"Please accept this as notice that we expect you to comply with all provisions of our agreement.
"If this is not done we regret very much to say that we will be forced to turn the whole matter over to our Attorney.
"Sincerely yours,
"Arkansas Valley Feed Mills, Inc.
"Harold Snyder
"President"
(Plaintiff's Exhibit No. 7)

Although this letter was answered by a letter from the defendant's attorneys, dated October 27, 1954, in which Snyder was told that the defendant was relying upon the cancellation agreement of August 2, 1954, there was no further correspondence between the parties, and neither Snyder nor the Board of the plaintiff corporation in any way notified the defendant of their contention that the cancellation agreement was void, and no further action was taken to claim under the orginal contract until this suit was filed on December 31, 1957, more than three years after the defendant advised the plaintiff that it was relying upon the cancellation agreement.

## Discussion

By the pleadings and briefs the parties have raised five questions which go to the issue of whether or not the cancellation agreement, executed by Harold Snyder on August 2, 1954, at any time became effective:

1. Did Harold Snyder as president and general manager of the plaintiff corporation have actual authority to execute the cancellation agreement?

2. Did Snyder have apparent authority to execute the agreement?

3. Did the corporation ratify the cancellation agreement?

4. If the cancellation agreement was otherwise effective, was there an oral condition precedent to be complied with before the cancellation agreement became effective?

5. Was the cancellation agreement an accord and satisfaction which were never consummated?

(1) As the court pointed out in disposing of the motion for summary judgment herein, D.C., 163 F.Supp. 759, the mere fact that one is an officer of a corporation does not in and of itself confer upon that person actual authority to operate the business of the corporation or to bind it in any particular. See, City Electric Street Ry. Co. v. First National Exchange Bank, 62 Ark. 33, 34 S.W. 89, 31 L.R.A. 535.

On the other hand, of course, a corporation is bound by the acts of its agents, if they act within the scope of their authority, whether or not those agents are officers of the corporation.

The testimony in this case makes it clear that Harold Snyder was throughout the existence of the plaintiff Mills the driving force in the successful operation of the corporate business. He acted both as president and general manager. Whether or not he was granted specific authority to execute the cancellation agreement is not material. Briefly stated, the rule followed by the Supreme Court of Arkansas is that even absent specific authority contracts made on behalf of a corporation are binding upon that corporation when (a) executed by a general manager, and (b) deal with matters in the ordinary conduct of the corporate business. In Browne-Brun Wholesale Grocery Co. v. Hinton, 1929, 179 Ark. 831, at pages 833–834, 18 S.W. 2d 369, at page 370, the court said:

"It is claimed that this instruction is inherently wrong because the president was not authorized to make contracts for the corporation unless given such power under the by-laws. We do not agree with ap-

pellant in this contention. Browne was president and general manager of appellant. This gave him authority to execute contracts which were necessary to the conduct of the business of appellant. The release was a contract which was necessary to carry on the business, and Browne had the authority to execute it. Wales-Riggs Plantations v. Caston, 105 Ark. 641, 152 S.W. 282, C. L. Kraft Co. v. Grubbs, 116 Ark. 520, 174 S.W. 245, and Southern Bauxite Co. v. Brown-Pearson Cash Feed Store, 172 Ark. 117, 288 S.W. 377."

Thus, under the law of Arkansas, when a general manager acts in the ordinary or necessary course of business of the corporation, he acts with actual authority. It may be that this rule would not be conclusive if proof were made showing specific limitations upon his actual authority. Probably such proof would render the issue on his authority a question of fact. The rule seems to have been so regarded in Marquette Cement Mfg. Co. v. Campbell Construction Co., 6 Cir., 1950, 184 F.2d 352 (construing Arkansas law). Accepting the view that the Browne-Brun rule is in the nature of a rebuttable presumption rather than an absolute rule of law, it is nevertheless determinative here, because there is no proof that either the charter, by-laws or board of directors of the plaintiff corporation imposed any limitations upon the authority of the general manager. On the contrary, the evidence is convincing that the directors had the highest confidence in the abilities of Snyder to manage the corporation in every respect.

Aside from the rule announced in this decision, that a general manager has authority to do all acts necessary to the conduct of the corporate business, however, the evidence affirmatively shows that Snyder had actual authority to make contracts for the plaintiff.

Actual authority, of course, may exist because of express authority, either oral or written, delegated by the principal, in this case the corporation,

or actual authority may derive from implication in the principal's words or deeds. See, Rest., Agency, Sec. 8d; cf. St. Louis, I. M. & S. R. v. Jones, 96 Ark. 558, 132 S.W. 636, 37 L.R.A.,N.S., 418. Implied authority in this sense is a species of actual authority; and unlike apparent authority does not rest upon any concepts of estoppel, but upon the fact that authority is actually granted even though by implication. Thus, implied authority, although it may rest upon similar facts, is distinguished from apparent authority in that it is authority actually granted by the principal.

The evidence makes it abundantly clear that Snyder had the actual authority to operate all phases of the corporate business. The only concrete limitation upon Snyder which the testimony reveals is that upon one occasion the corporate Board of Directors advised him that there were too many accounts receivable and that he should collect them as soon as possible. Even on this occasion the Directors, so far as the testimony reveals, did not impose any policy limiting the amount of credit to be extended. It seems probable from the testimony that from time to time the Directors reviewed the business of the corporation, but there is no evidence whatever to suggest that the Board of Directors set any policies of the business. On the contrary, the evidence is that the Directors never at any time disapproved any of Snyder's acts, and it appears that they acquiesced in every step that he took in the management of the business. It was Snyder's practice in making contracts with the defendant and apparently with others to make what he called "memorandum" agreements. From the copy in evidence of the memorandum agreement which preceded the final integrated marketing contract of December 14, 1953, on which the plaintiff sues here, it appears that these "memorandum" agreements were binding contracts although, in all probability, all of the details agreed upon were not included. Nevertheless they included all the necessary terms for the enforcement of the agreement. The Board of

Directors never at any time even suggested to Snyder that he desist in his practice of making such agreements without prior approval of the Board. It may be that the Board of Directors did not view these contracts as binding upon the corporation. But, as the defendant points out, even if the Directors misinterpreted the legal effect of these agreements, they permitted Snyder regularly to sign such agreements in the name of the corporation. Furthermore, the evidence reveals that Snyder executed a number of documents dealing with real property, including deeds, leases and mortgages, none of which have ever been repudiated by the Board of Directors. Neither has the Board at any time indicated to Snyder that he was acting outside his authority in executing such documents. It is apparently true, as Snyder testified, that these instruments did not concern any substantial amount of money. However, it is their character rather than their consequence which is the controlling factor, and the fact remains that Snyder assumed and the Directors never questioned his authority to execute various legal instruments of the corporation.

The court concludes that whether or not the mere position as president and general manager would confer actual authority as indicated in the Browne-Brun case, supra, the Board of Directors of the plaintiff corporation did confer authority by implication by relying on Snyder to do all acts necessary to the operation of the business and in acquiescing to all of his acts.

▇ The plaintiff in its brief argues that Snyder's authority was limited by the bylaws and charter of the corporation. It is, of course, true that any limitation imposed by the charter or bylaws would be effective to limit Snyder's actual authority. Article VI, Section 2, of the bylaws of the plaintiff provides:

"The president shall preside at all Stockholders meetings, shall have general supervision of the affairs of the corporation, and over the other officers; shall sign all stock certificates, and shall perform all such other duties as are incident to his office."

Given the fullest effect possible, this section of the bylaws does not purport to limit the authority of a general manager nor does it purport even to limit definitively the authority of the president. On the contrary, this section of the bylaws specifies some of the affirmatives duties of the president, but even if regarded as limiting his authority to those duties, it further provides that "he shall perform all such other duties as are incident to his office." This section, therefore, merely raises the same question which is before the court—that is, whether Snyder, acting as president and general manager, was authorized to execute the cancellation agreement.

▇ The plaintiff also argues in its brief that inasmuch as the management of the corporation is vested in the Board of Directors, both by statute and the bylaws, the president of the corporation would have no authority to manage the business. It has always been true that the ultimate responsibility for the management of a corporation rests upon the Board of Directors, but it has never been assumed that the Directors must actively participate in the operation of the business or even in every decision of policy. If such were the rule, this plaintiff could never be held to its contracts since it appears that the Directors almost wholly abdicated all responsibility and depended upon Snyder to conduct the business. Under decisions of the Supreme Court of Arkansas, the Board of Directors, notwithstanding their ultimate responsibility for the management of the corporation, may delegate such authority as they may deem necessary to an officer or to a general manager who is not an officer. See, Browne-Brun Wholesale Gro. Co. v. Hinton, supra, and cases cited.

▇ Finally, on the issue of actual authority the plaintiff argues that whatever authority Snyder might have had, he was certainly not authorized "to give away a claim of the value of $72,349.41."

As already indicated, however, it is the character of the acts done which determine whether or not they are within the authority granted and not the consequence of those acts in terms of loss or gain to the corporation. Even assuming, as the plaintiff does, that the value of the contract before the cancellation agreement was executed was in the amount stated, it may have resulted in a benefit to the plaintiff by giving it an opportunity to sell its chickens on the open market. Certainly the plaintiff and Snyder as its general manager so thought at the time. The fact remains, regardless of what benefit may or may not have accrued to the plaintiff under the contract sued upon, that the sale of chickens was an ordinary part of the business of the plaintiff, and contracts in respect thereto were treated by the Board of Directors as being within Snyder's actual authority. That being the case, the amount involved is not material, absent any indication that the Board imposed or implied a limitation upon the dollar value of contracts negotiated and executed by Snyder. Since the cancellation agreement was well within the area of the authority granted to Snyder, the amount involved cannot be determinative of this issue.

(2) Although the issue as to Snyder's authority is determined by the court's conclusion that he had actual authority to execute the cancellation agreement, many of the decisions of the Supreme Court of Arkansas, while recognizing the existence of actual authority, have rested upon the proposition that there was also apparent authority on the part of the corporation officer involved. For that reason the court is following that practice and considering whether the facts justify a holding that Snyder had apparent authority to execute the cancellation agreement.

It appears to be settled that regardless of any actual limitations imposed upon a corporate officer or agent, that if he had apparent authority to transact the business, the corporation will be bound by those transactions. In McMillan v. Marathon Oil Co., 1934, 188 Ark. 937, at page 940, 68 S.W.2d 473, at page 474, the court said:

"Springer, Sheets and Nix were all employees of appellee. They assumed to act for it in the premises and we think were acting within the apparent scope of their authority. Springer, being the general manager for sales in this state—the others acting under him—had the apparent authority of transacting any business for his principal that would further, or tend to further, the business of his principal of which he is the general manager. It is well known that oil companies market their products through filling stations or service stations, either owned by them in fee, or operated by them under a lease, or through dealers handling their brands of merchandise. Such being the case, Springer, no doubt, had the express authority to negotiate for leases on property for filling station purposes, and bind his principal by contracts of this nature. At least, he had the apparent authority so to do. Moreover, both Sheets and Springer were admitted agents, and we have many times held that one dealing with an admitted agent had the right to presume, in the absence of notice to the contrary, that he is a general agent, clothed with authority coextensive with its apparent scope. Hal H. Peel & Co. v. Hawkins, 175 Ark. 806, 300 S.W. 420, and cases there cited. Also it is true that Springer is the general agent, and we have many times further held that generally the principal is bound by all acts of a general agent which are within the apparent scope of his authority, whether they have been authorized or not. Oil City Iron Works v. Bradley, 171 Ark. 45, 283 S.W. 362; A. J. Chestnut Co. v. Hargrave, 177 Ark. 683, 7 S.W.2d 800."

The court is not unaware that the rule above quoted, to the effect that one dealing with an admitted agent could

presume him to be a general agent, apparently no longer obtains in Arkansas, at least in suits upon insurance policies. However, the general rule set forth that acts of a general manager which further or tend to further the business of the principal are binding upon the corporation has not been impaired by more recent decisions. In Southern Electrical Corp., Inc., v. Ashley-Chicot Elec. Co-Op. Inc., 1952, 220 Ark. 940, at pages 943–944, 251 S.W.2d 813, at page 815, 252 S.W.2d 411, the court:

"As we view the record there is no evidence to show that Pentecost was not acting 'within the apparent scope of his authority' when he agreed, on behalf of appellee, to the change in price, but there is abundant evidence to show he was so acting. Without encumbering this opinion by detailing the evidence, it is deemed sufficient to point out: that Pentecost had been the manager for several years, clothed with full apparent authority to transact business of this same character for appellee; he had formerly made similar purchases from appellant; he wrote checks on his company and none was turned down; and his transactions were only supervised by the board of directors meeting for an hour or two each month, at which time they scarcely, if ever, made any objections or even checked over his records."

In Wales-Riggs Plantations v. Caston, 1912, 105 Ark. 641, at pages 645–646, 152 S.W. 282, at page 283, the court said:

"The acts of a president done in the management of the business and within the scope of his authority are held to be the acts of the corporation itself. 2 Thompson on Corporations, (2d Ed.), § 1465, page 515; Ib. § 1493. The same author, in section 1491, says: 'Third persons and strangers dealing with the president of a corporation under ordinary circumstances, and especially where he has the management and control of the business, are protected. The law shields such persons in so many different ways as to make it comparatively, if not absolutely, safe to deal with the president of a corporation under such circumstances. In the first place, where a corporation qualifies the president with the power of the general management of the corporate affairs, or where it permits him to act as general manager for a length of time, it is estopped from denying in such instances that its president has the powers with which it has qualified him, or which it has customarily permitted him to exercise. Hence, in any conflict between such third persons and the corporation, it is sufficient to prove the president's authority in the usual way of proving the authority of other agents, either that he was especially appointed to conduct the business, or that the corporation held him out to the public as possessing the powers which he actually exercised.' "

This court in J. H. Phipps Lumber Co. v. Omaha Hardwood Lumber Co., D.C. W.D.Ark.1941, 40 F.Supp. 723, reversed on other grounds in 8 Cir., 135 F.2d 3, in construing the Arkansas law on this question, said at page 727 of 40 F.Supp.:

"The fact that Clark occupied the position of general manager was sufficient to bind the plaintiff on anything pertaining to the ordinary business of the corporation, but did not bind the corporation if the act done or the agreement entered into by him was without the apparent scope of the business actually carried on by the plaintiff and entrusted to his management."

See also, Co-Op Stores v. Marianna Hotel Co., 1917, 128 Ark. 196, 193 S.W. 529.

The rule followed by the Arkansas courts, therefore, is that when a general manager acts in the ordinary business of his corporation, his acts are at the very least within his *apparent* authority. These cases do not make it

clear whether or not such a conclusion could be rebutted by contrary evidence or even whether the other elements of apparent authority must be shown before the corporation is bound. Assuming, however, that an act of a general manager in the ordinary course of corporate business would not be irrebuttable proof of apparent authority, there is no proof to suggest that Snyder was not acting within the apparent scope of his authority. On the contrary, the evidence abundantly shows that the corporation held him out and permitted him to hold himself out as the general manager without limit on his authority to execute contracts. He had previously executed two so-called memorandum agreements with this defendant without prior approval of the Board, and although both memorandum agreements were subsequently reduced to formal written contracts, the Board of Directors at no time indicated to the defendant that it did not regard the memorandum agreements as binding, nor did it advise the defendant that Snyder had no authority to make final negotiations. In view of Snyder's negotiation and execution of these contracts, the defendant would certainly be justified in relying upon Snyder's authority to execute such contracts. Furthermore, Snyder was the only person with whom the defendant and its agent dealt in negotiating and executing the contracts, and the only person with whom the defendant dealt in the dispute which led to the cancellation agreement. Thus, even aside from the fact that Snyder was both president and general manager, and aside from the fact that he was acting in the ordinary course of business in making the cancellation agreement, there is no doubt that Snyder held himself out and was held out by the corporation as having authority to execute its contracts. There is evidence, as indicated previously, that Snyder executed other instruments as well, but since there is no showing that the defendant was aware of Snyder's execution of title instruments, the court does not consider the execution of these documents as bearing on the issue of *apparent* authority.

It is also clear that the defendant acted in reliance upon the authority or apparent authority of Snyder to execute the cancellation agreement. Not only did it immediately cease operations under the original contract, but it affirmatively advised the plaintiff that it was relying upon the cancellation agreement in its letter of October 27, 1954. In the case of the cancellation agreement the defendant did not, as it had previously, draw a more formal written agreement. These facts establish that the defendant was relying upon the agreement and the apparent authority of Snyder to execute that agreement. Therefore, even if the position as president and general manager of a corporation is not enough to give such officer apparent authority to execute contracts in the ordinary course of the corporate business as indicated by the above-cited cases, the ordinary elements of apparent authority exist in this case. See, Central Surety & Ins. Corp. v. O. & S. Wholesale Co., Inc., 193 Ark. 523, 101 S.W.2d 167. Thus, giving the decisions the most favorable interpretation possible to the plaintiff, the court must still conclude that Snyder had apparent authority to execute the cancellation agreement even if he had not had the actual authority to do so.

(3) Even aside from Snyder's actual and apparent authority to execute the cancellation agreement, the corporation ratified its execution.

The defendant, in arguing this point, asserts that the Feed Company, having taken over the performance of the marketing contract with the defendant, was in fact the agent of the plaintiff Mills corporation. From this the defendant argues that the Feed Company ratified the cancellation agreement by accepting the defendant's check of October 1, 1954, from which was deducted the indebtedness mentioned in the cancellation agreement. The plaintiff, on the other hand, asserts that the Feed Company was not its agent notwithstanding that the Feed Company admittedly performed the mar-

keting contract with the defendant, and notwithstanding the evidence that the Feed Company was very largely dominated in the performance of that contract by Snyder's operation of the Mills. If the Feed Company was not acting as agent for the plaintiff in the performance of the marketing contract with the defendant, then the only conclusion available is that it was acting wholly independently and as assignee of the marketing contract. If that is the case, then the real party in interest and the proper party plaintiff would be the Feed Company and not the Mills which is the only plaintiff in this suit.

Be that as it may, the acceptance of the check which was done only after securing Snyder's permission is an equivocal act, and was as consistent with non-ratification as it is with ratification of the cancellation agreement because, regardless of the cancellation agreement, the amount deducted from the check was a debt admittedly due to the defendant, Fox De Luxe Foods, Inc. It is true that the voucher accompanying the check was marked to indicate that the deduction was made under the cancellation agreement. That marking was ambiguous. While a fact question may be presented as to whether the cancellation agreement was ratified by the acceptance of the defendant's check of October 1, the court prefers to rest the issue of ratification on grounds which are more certain.

The evidence established that the plaintiff corporation acquiesced in the cancellation agreement, and under the facts and circumstances of the case that acquiescence must be taken as an intentional ratification. The plaintiff points out that ratification is the adoption and confirmation of an agent's unauthorized act, and that no ratification can be found, with possible exceptions not relevant here, unless the principal has full knowledge of the material facts surrounding the agent's unauthorized transaction. Grady v. Dierks Lbr. & Coal Co., 154 Ark. 255, 242 S.W. 548; Emco Mills v. Isbrandtsen Co., 8 Cir., 1954, 210 F.2d 319, and cases cited.

Furthermore, the doctrine of ratification is not based upon the carelessness or negligence of the principal, and even though ordinary care might dictate that he inquire as to the material facts surrounding the unauthorized transaction, the transaction is not ratified without actual knowledge on the part of the principal. Runyan v. Community Fund, 182 Ark. 441, 31 S.W.2d 743.

Relying upon these rules, the plaintiff contends that it did not ratify the cancellation agreement executed by Snyder because it had no knowledge of the agreement until after the time when performance under the original marketing contract would have been completed. The facts do not support this argument. It is true that Snyder did not exhibit a copy of the cancellation agreement, and that agreement was not seen by the Board of Directors until after the expiration date of the marketing contract with the defendant. However, it seems equally certain that the Board of Directors was aware that a cancellation of the marketing contract had been made. Donald Barger was a member of the Board for at least some time after the cancellation agreement was entered into, and attended at least one meeting of the Board of Directors after that time. He was informed of the cancellation agreement. Snyder himself, of course, was also a member of the Board of Directors. Charles Boyce, who was made a member of the Board in September 1954, is a brother-in-law to Harold Snyder, but did not recall what business was discussed at the meeting of the Directors in September 1954; yet he had been a full-time employee of the Mills since 1953 and worked together with Snyder. Gretchen Goodier, a secretarial and bookkeeping employee of the Mills, who also owned a small portion of the stock, was a member of the Board, and while she testified that she did not remember when she first knew of the cancellation agreement, she was apprised of the general terms of the cancellation within a very short time because the bookkeeping system was necessarily changed following the cancella-

tion. Prior to the cancellation it had been necessary while the defendant was buying chickens under the contract to make accountings on "Weekly Adjustment Sheets." When the marketing contract was terminated by the cancellation agreement, the birds were bought on the market and the adjustments in price called for in the marketing contract became unnecessary. After August 2, 1954, no Weekly Adjustment Sheets were made or used in figuring the prices on the sales and purchases between the plaintiff and defendant. The only conclusion the court can reach is that the Directors of the plaintiff corporation had a substantial understanding of the material facts involved in the cancellation of the Fox contract unless the court concludes that Snyder was deliberately and fraudulently withholding from his Directors this information. As indicated in finding number 8, the court has found that the Directors were advised of the cancellation.

In addition to the acquiescence of the corporation between August 2 and October 20, 1954, no notice was ever furnished the defendant or any of its agents after that time that Snyder had no authority to execute the contracts of the corporation. This is true in spite of the fact that the defendant specifically advised the plaintiff by its letter of October 27, 1954, that it was relying upon the cancellation agreement.

The plaintiff then asserts that any ratification here would be implied rather than express ratification, and that before such ratification could be found, it would be necessary for the defendant to show the acceptance of the benefit under the cancellation agreement which benefit accrued to the plaintiff.

This contention cannot be sustained under the law of Arkansas. In St. Louis-San Francisco Railway Co. v. Lee Wilson & Co., 1947, 212 Ark. 474, at page 481, 206 S.W.2d 175, at page 178, the court said:

"The testimony shows that defendant ratified the unauthorized acts of Regenold in signing bills of lading for shipment of alfalfa meal. It is well settled that when a principal has knowledge of the unauthorized acts of his agent and remains silent when he should speak, or accepts the benefits of such acts, he cannot thereafter be heard to deny the agency, but will be held to have ratified said agent's unauthorized acts. Coffin v. Planters' Cotton Company, 124 Ark. 360, 187 S.W. 309, and cases there cited; Kirkpatrick Finance Co. v. Stotts, 185 Ark. 1089, 51 S.W.2d 512; Restatement of the Law of Agency, Vol. 1, Sec. 94."

Under the rule announced in the above decision, a ratification may be implied where the principal either remains silent when he should speak, or accepts the benefits of his agent's unauthorized acts. In Emco Mills v. Isbrandtsen Co., supra, the defendant had orally agreed with a broker to sell 10,000 bushels of soybeans to the plaintiff. When the broker completed the confirmation slip, he erroneously showed the sale to be 50,000 rather than 10,000 bushels. The defendant noted the error but regarded the confirmation as merely a memorandum rather than a final contract, and did not at that time call the error to the attention of either the broker or the buyer. When he failed to fulfill the contract for 50,000 bushels, the plaintiff buyer was required to buy it at a higher price on the open market. It was the plaintiff's contention that the defendant ratified any error which might have existed by failing to advise either the broker or the plaintiff that the confirmation was erroneous. Speaking of the defendant, the Court of Appeals said at page 325 of 210 F.2d:

"No inference may be drawn from his testimony that he did not know of the terms of the commitment. He says that he received it and treated it as a memorandum needing no acknowledgment. Under the law it needed no acknowledgment only in the event it was correct. Lack of knowledge of the legal effect of defendant's nonaction will not avoid

ratification. Defendant owed the legal duty under the circumstances to correct its agent's commitment within a reasonable time or be bound by it. We cannot relieve it of that duty. In the absence of an applicable established practice or custom, or an agreement between the parties fixing the time within which notice should be given of an improper act of an agent, the timeliness of such action will be determined by the facts and circumstances in each case. It may well be that under some circumstances the question will be one for a jury. But under the undisputed facts of this case, notice was not given within a reasonable time and if the jury had found to the contrary it would have been the duty of the court to set such finding aside. The legal effect of defendant's nonaction was ratification, insofar as plaintiff's rights were concerned."

■ It is difficult to imagine a situation which would more clearly impose upon the principal a duty to speak than the instant case. The plaintiff corporation had dealt with the defendant solely through Snyder on several previous occasions, and Snyder had executed what on its face appeared to be a valid contract of cancellation. As soon as that contract of cancellation had been executed, the defendant proceeded to act accordingly by purchasing chickens at the market rather than at the contract price. There was no reason for the defendant to have the slightest suspicion that the plaintiff corporation would repudiate Snyder's agreement even after Snyder wrote his letter of October 20 to the defendant's Dardanelle manager in which he advised that he expected the defendant to comply with "the" contract. The defendant had no reason to regard this letter signed only by Snyder as being within any more authority than the cancellation agreement signed by Snyder. In other words, this letter was not notice from the corporation itself or its Board of Directors, or if it was, it carried no

more weight than the execution of a contract by Snyder. The defendant's attorneys immediately thereafter called Snyder's attention to the cancellation agreement of October 27, 1954. The fact that the plaintiff corporation remained silent for over three years under the circumstances of this case is significant. The plaintiff corporation and its Directors must have understood prior to the defendant's letter of October 27 that the defendant was acting and relying upon the cancellation agreement. Certainly after they were so notified by the letter of October 27 from the defendant's attorneys, they could not in good conscience permit the defendant to rely any further upon the cancellation agreement if it was in fact executed without authority. Under those circumstances it must be concluded that it was incumbent upon the plaintiff to speak its contentions, and having failed to speak, they ratified the cancellation agreement even if it had been executed without authority.

■ (4) The plaintiff contends that in the event the court finds that Snyder had authority to bind the Mills by the cancellation agreement, that the agreement was nevertheless ineffective. This contention is based upon the theory that there was an oral condition precedent imposed upon the written cancellation agreement and that this condition, having never been performed, prevented the cancellation agreement from taking effect. To support this theory the plaintiff relies upon Southern Wooden Box, Inc., v. Ozark Hardwood Mfg. Co., 1956, 226 Ark. 899, at page 902, 294 S.W.2d 761, at page 763, where the court said:

"Even in the case of a written contract duly executed by both parties, this court has repeatedly held that parol evidence is admissible to prove that it was not to be a complete and binding agreement until certain conditions precedent have been fulfilled. Barr Cash & [Package Carrier] Co. v. Brooks-Ozan Mer. Co., 82 Ark. 219, 101 S.W. 408; American Sales Book Co. v. Whitaker, 100 Ark. 360, 366, 140 S.W. 132,

37 L.R.A.,N.S., 91; Worthen v. Stewart, 116 Ark. 294, 172 S.W. 855; Reynolds v. Ashabranner, 212 Ark. 718, 207 S.W.2d 304, 307. In the Reynolds case we said: 'The situation here is not that of a waiver of a condition precedent stated in the written contract; rather, it is the waiving of a condition precedent to the coming into existence of the contract. See 17 C.J.S. Contracts § 338, p. 792, on "Conditions Precedent." In 13 C.J. 791, in discussing the waiver of a condition precedent in actions concerning contracts, the general rule is stated: "The question as to whether a condition precedent has been performed is purely one of fact to be determined by the jury under the evidence. And the same has been held to be true of the question as to whether the performance of such condition has been waived, but the jury should be properly instructed as to the law." See also 17 C.J.S. Contracts, § 630 [p. 1297].' "

Under the authority of this case, the court allowed Snyder to testify as to an alleged parol condition precedent. The testimony reflected that this alleged condition precedent was made prior to the time the cancellation agreement was reduced to writing and executed. The testimony was admitted conditionally because unless it shows that a condition precedent was made, the testimony would be inadmissible under the parol evidence rule.

Snyder testified in essence that in the negotiations in Chicago, which resulted in the cancellation agreement, that he insisted that if the cancellation was to be made, that the defendant would stop "buying on grade," meaning apparently that the defendant would not pay a reduced price for chickens which did not meet the top standards. There is conflicting testimony to the effect that no such agreement was made. It is apparent that if the contract was to be cancelled, no contract would exist between the parties, and the defendant according-

ly would be free to purchase chickens at whatever price it might negotiate or to purchase no chickens whatever. By the same token, the plaintiff would be entitled to offer chickens for sale at whatever price it might negotiate with defendant or refuse to sell to the defendant altogether. The alleged condition precedent that the defendant would stop grading the chickens seems hopelessly at odds with the expressed intention of the cancellation agreement. If such a condition precedent were imposed, the net effect would be that the defendant would be obliged to purchase chickens from the plaintiff sight unseen or not to purchase them at all. The alleged condition precedent is so inconsistent not only with ordinary business practices but with the terms of the cancellation agreement itself, that it cannot be accepted and harmonized with the cancellation agreement. The effect of the alleged condition precedent would be to nullify the cancellation agreement which was subsequently executed.

But aside from ordinary business practices and considerations of this kind, the court has found in Finding of Fact No. 3 that no agreements of any kind were made during Snyder's visit to Chicago, except those which are reflected in the cancellation agreement. Since there was no condition precedent to the operation of the cancellation agreement, it was effective to bar any claim under the orginal marketing contract.

(5) Finally, the plaintiff argues that the cancellation agreement was an accord, but that there was no satisfaction. It concludes, therefore, that no satisfaction having been made of the accord, it was free to sue upon the original marketing contract. The plaintiff's argument, briefly stated, is as follows:

Snyder, prior to the execution of the written cancellation agreement, made an alleged oral agreement with defendant that if the cancellation agreement was signed, defendant would stop "buying on grade." This oral agreement was the "real consideration" for the cancellation and that being so, it is admissible in evi-

dence, since the real consideration for a contract may always be shown. From this position it is then deducible that the cancellation agreement was merely an "accord" and that the "satisfaction" thereof would be performance of the alleged oral agreement to "stop buying on grade."

█ It is familiar law that an accord without a satisfaction does not bar suit upon the original obligation. See Lyle v. Federal Union Insurance Co., 1944, 206 Ark. 1123, 178 S.W.2d 651 and cases cited; De Maio, "Recent Developments in the Law of Contracts," 3 Ark.L. Rev. 81 at 86–90.

█ Although ordinarily the issue of accord must be pleaded, the parties argue the merits of this issue.

█ An accord is simply an agreement between the parties which is substituted for a prior agreement and whereby one party agrees to accept the performance called for by the accord in lieu of that called for by the original agreement. The court in Arkansas Farmers Ass'n, Inc., v. Yohe, 1957, 227 Ark. 670, 300 S.W.2d 589, and Jewell v. General Air Conditioning Corp., 1956, 226 Ark. 304, 289 S.W.2d 881, quoted with approval the more extended definition in 1 C.J.S. Accord and Satisfaction § 1:

> "An 'accord' is an agreement whereby one of the parties undertakes to give or perform, and the other to accept, in satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is, or considers himself, entitled to; and a 'satisfaction' is the execution or performance, of such an agreement."

Passing for a moment the factual questions inherent in the plaintiff's argument and going to the issue earnestly argued by the parties, does Snyder's version of the transaction constitute, if true, an accord? If so, there is admit-tedly no satisfaction, and the plaintiff would in that event be free to sue upon the original marketing contract.

While the plaintiff insists that the cancellation was merely an accord which could not have been satisfied until the alleged oral agreement was performed, the defendant is equally insistent that the agreement constitutes a "compromise." A compromise, the defendant argues, is a new contract and performance is not necessary to its validity. See, 11 Am.Jur., "Compromise and Settlement," Sec. 2.

Just as the character of pleadings is not determined by the name appended by the parties, the nature of a transaction is not determined by the terms the parties apply to it, and the court concludes that neither "accord" nor "compromise" is fairly descriptive. A similar problem was raised in Jewell v. General Air Conditioning Corp., supra. In that case the plaintiff brought suit to restate an alleged account stated, alleging mutual mistake or fraud. The defendant contended that the transaction involved was not an account stated but an accord and satisfaction. Finding that there was no dispute over the amounts owed by the parties, the court held that there could be no accord and satisfaction, notwithstanding the defendant's characterization of the transaction as such.

█ Here, the court concludes that there was neither compromise nor accord, but merely a discharge or rescission of the original marketing contract by mutual agreement. As stated in 2 Rest., Contracts, Sec. 406:

> "Except in the case of contracts for the benefit of third persons an agreement by the parties to a contract to rescind their contractual duties, or duties to make compensation, discharges such duties if the agreement is under seal, or is based on sufficient consideration * * *."

There is nothing in evidence to suggest that either of the parties intended to exe-

cute either a "compromise" in which a dispute was settled by a new agreement or an accord in which a dispute was to be settled by a new and different performance. While an accord may be by written contract, it is usually oral, whereas here the cancellation agreement was a written and integrated instrument. Ordinarily, the issue of accord arises where there is a debt or performance due from one side to the other. Usually there is little dispute that such performance is owed in some amount or to some extent, and the dispute exists as to what amount or extent performance is owed. Although here there was certainly some dispute, it related to the way in which the contract was being performed, i.e., by grading plaintiff's chickens. There was no dispute as to amounts involved except insofar as it related to the grading of the chickens, it being the plaintiff's contention that the grading was unauthorized or at least that it was unfairly pursued. In this situation, the only accord conceivable is that some other *performance* of the contract be accepted. Yet the cancellation agreement does not call for other and less performance, even if the alleged oral agreement is considered a part of that agreement. It calls instead for no performance at all, by either party. For the same reason it cannot be fairly called a compromise. One party did not give more than the other or accept less performance than called for. Both parties simply agreed that the original contract was to be considered discharged. This is nothing more nor less than a mutual agreement to rescind.

■■■■ Even if the transactions concerning the cancellation agreement could be treated as an accord, it is clear that the accord itself, that is, the promise of new and different performance, can be the satisfaction. Once the transaction between the parties is treated as an accord rather than a compromise or a rescission, there must be "clear evidence" that the accord was intended as the satisfaction to rebut the presumption that actual performance is the only satisfaction. In Arkansas Farmers Ass'n, Inc., v. Yohe, supra, at page 674 of 227 Ark., at page 592 of 300 S.W.2d, the court said:

> "Williston On Contracts, Revised Edition, Vol. 6, § 1847, has this pertinent statement relative to accord and satisfaction:
>
> " 'It is often extremely difficult to determine as a matter of fact whether the parties agreed that the new promise should be itself the satisfaction of the original cause of action, or whether they contemplated the performance of the accord as the satisfaction. Unless there is clear evidence that the former was intended, the latter kind of agreement must be presumed * * *.' "

See also, Lyle v. Federal Union Insurance Co., supra; Whipple v. Baker, 1908, 85 Ark. 439, 108 S.W. 830; Annotation 10 A.L.R., at 236 ff and cases cited.

■■■■ Even treated as an accord, therefore, the alleged promise may itself be the "satisfaction" required. The convincing evidence that the promise itself should be treated as satisfaction is found in the cancellation agreement. That agreement recognizes a debt due from the plaintiff to the defendant and calls for payment of that debt, but the agreement also specifically provides that notwithstanding that debt the agreement to cancel was immediately effective. In other words, the failure of the plaintiff to perform by paying the debt was not to render the cancellation ineffective. Yet the plaintiff contends, as to the alleged oral agreement not included in the written cancellation, that failure to perform would render the cancellation ineffective. The court cannot accept this argument. If such an oral agreement had been made, and if the cancellation transaction could be treated as an accord rather than as simply a rescission, nevertheless the parties did not at any time contemplate that performance of the alleged oral agreement was necessary to

effectuate the cancellation. In other words, the alleged promise on the part of the defendant, if it existed, would have been itself the "satisfaction."

But there is an additional reason why the court cannot find an accord. The court has found as a fact that no such promise was made on the part of the defendant or its representatives. There was, no doubt, discussion about the defendant's grading of the plaintiff's chickens. That was the issue between the plaintiff and defendant and the purpose of Snyder's visit to Chicago. But the alleged promise to stop grading is so inconsistent with the subsequent written cancellation agreement that the court must accept the testimony of the defendant's representatives and former representatives that no such oral promise was made.

Under the facts the court has concluded that Snyder had actual and apparent authority to execute the cancellation agreement, and that, in any event, it was ratified by the plaintiff corporation. The evidence also convinces the court that no oral agreement was made between Snyder and the defendant's representatives other than as set forth in the cancellation agreement. Since, as a matter of law, the testimony as to an oral agreement was not sufficient to show an accord or a condition precedent, the testimony provisionally admitted on this issue was not admissible under the parol evidence rule.

The cancellation agreement barred any and all of the plaintiff's claims.

Since plaintiff is not entitled to recover from the defendant, the third-party complaint of defendant against Harold Snyder should be dismissed.

## Conclusions of Law

### 1.

The court has jurisdiction of the parties and of the subject matter of this action.

### 2.

Harold Snyder as president and general manager of the plaintiff corporation was invested with actual authority to execute the cancellation agreement of August 2, 1954, on behalf of the plaintiff, and acted within the scope of his authority in executing that agreement.

### 3.

Even if no actual authority had been vested in Harold Snyder, he had apparent authority to execute the cancellation and the defendant relied upon such apparent authority.

### 4.

The plaintiff corporation was obligated to advise the defendant within a reasonable time of learning that the cancellation had been executed that Snyder was without authority, if that were the case. Having remained silent under such conditions, the plaintiff corporation's conduct amounted to ratification of the cancellation, even if Snyder had not had authority to execute the same.

### 5.

The cancellation agreement did not constitute an accord which was unsatisfied, and the plaintiff did not, therefore, have any right to recover upon the original agreement. There was no condition precedent to the operation of the cancellation agreement.

### 6.

The cancellation agreement was therefore valid and effective and barred all claims which the plaintiff might at any time have had against the defendant.

### 7.

The complaint of the plaintiff against the defendant and the third-party complaint of defendant against the third-party defendant, Harold Snyder, should be dismissed, and the defendant, Fox De Luxe Foods, Inc., should have and recover of and from plaintiff its costs, and a judgment in accordance therewith is being entered today.