

*Will G. Akers,* for appellant.

*U. A. Gentry,* for appellee.

HOLT, J. Appellant brings this appeal from a decree of the Pulaski chancery court in favor of appellees in the total sum of $1,660.50 for alleged commissions and bonuses earned by appellees while in the employ of appellant.

Appellees alleged in their complaint that while employed by appellant, first as salesmen and later as district sales managers, under contracts providing for certain commissions and bonuses, they were wrongfully discharged by appellant and that appellant without cause refused to pay to them commissions and bonuses alleged to be due.

The complaint further alleged that the amounts due plaintiffs were unknown to them and asked for an accounting to determine these amounts and for judgment.

The contracts relied upon were made a part of the complaint and those provisions material here will be set out and considered hereafter in this opinion.

Appellant first demurred to the complaint on the ground that equity was without jurisdiction. The court overruled the demurrer and appellant answered denying every material allegation set up in appellees' complaint, and alleging that appellees had breached the contracts in question, had forfeited any and all rights to any alleged commissions and bonuses thereunder and were not entitled to recover anything from appellant.

The learned chancellor found the issues in favor of appellees and from this decree comes this appeal.

The record in this case is voluminous, however, the material facts are to the following effect:

Appellees, Edgar J. Browne and Roy E. Bell, were first employed by appellant under similar contracts on April 18, 1936, and on October 3, 1935, respectively. Under these contracts they were engaged as salesmen to sell Hamilton Trust shares for cash and on the installment plan. In case of installment purchases, appellees were paid when investors made their installment payments to appellant. Each of these contracts provided that if the contract should be terminated while the salesman was in good standing he should be paid all earned commissions and bonuses even though they might accrue after the termination of the contract. These contracts terminated on August 1, 1936, and February 3, 1936, respectively, and there is no evidence that appellees violated their terms.

On the dates last above mentioned, appellees entered into another contract with appellant in all respects similar to the first except as to commissions and bonuses, which were increased. These last mentioned contracts remained in force until January 3, 1938, when they were terminated by mutual consent and each of the appellees was given a contract as sales manager, increasing their

bonuses and commissions, and in which the general provisions in all other respects were similar to those in the previous contracts.

These last mentioned contracts continued in force until June 1, 1938, when they were terminated and new contracts, omitting certain provisions in the prior contracts, were entered into between appellant and appellees in which appellees were employed as district sales managers and these were the contracts under which appellees were serving appellant at the time of their discharge, and which they are alleged to have breached.

The material provisions of these contracts of June 1, 1938, with which we are concerned here, are:

Section 1 provides: "Nothing contained herein shall be construed to create the relation of employer and employee between the company and the district manager. . . ."

Section 6, Subdivision h, provides that appellees shall "Not engage in any business other than that covered by this contract during its continuance. In event the district manager violates the provisions of this contract, the same shall constitute an immediate breach hereof, and the company may cancel this contract and retain as liquidated damages all earnings accruing to the district manager's account."

Section 12 provides: "The district manager may terminate this contract after first having given the company thirty days' notice in writing of his intention so to do, and in case he discontinues his services hereunder without giving such notice he shall forfeit all earnings that are then due or will later become due him and the company shall retain and keep all such moneys as liquidated damages for losses sustained thereby. In case of dismissal of the district manager for cause, this contract shall terminate immediately upon written notice to the district manager at his last known address."

Section 13 provides: "If this contract is terminated while the district manager is in good standing hereunder and not indebted to the company, he shall receive any balance of earnings as the same accrue, even though they

accrue thereafter. Further, that under the above circumstances, the district manager shall receive bonus, provided he has been continuously and entirely in the services of the company for at least one year at the time of termination hereof.''

Section 19 provides: ''This agreement revokes and cancels all former contracts which have existed between the parties hereto relative to the sale of Hamilton Trust Share Certificates.''

One Erringer, prior to the employment of appellees by appellant, had been appellant's sales manager in Arkansas, and it was through him that appellees were first employed. Upon the death of the president of the appellant company, Erringer decided to organize a cororation known as the Arkansas Fund, Inc., patterned after that of appellant and made this known to appellees.

On August 8, 1938, appellees sent a letter on stationery of appellant to all the agents of appellant company in Arkansas, some thirty-five in number, urging them to attend an important meeting in Little Rock on August 17, 1938. Practically all of these agents attended this meeting at which they were informed of the organization of the Arkansas Fund, Inc. Appellee, Browne, was one of the incorporators and appellee, Bell, had agreed to become an officer and director.

On the part of appellant the testimony as to what transpired at this meeting tends to show that the salesmen assembled where urged to terminate their contracts with appellant. Other evidence presented by appellant tended to show that appellees, during their employment, neglected appellant's business to its damage, devoted time to the organization, and interest, of the new company, that their sales fell off before their discharge, and that thereafter appellant's business continued to grow smaller, and that the new company, which appellees helped to organize, and in which they were interested, prospered. The evidence is conflicting.

On the part of appellees, the testimony shows that these salesmen were merely informed of the new organization and its purposes. Appellees approved the plan, expressed their belief in the future possibilities of

the new company and a desire to have those salesmen present, who so desired, to associate themselves with the new company. They were informed at this meeting that before they could terminate their contract with appellant company they must give thirty days' written notice in advance. It appears that all but ten of the agents present decided to go with the new company, and their resignations, together with those of the former state sales manager and appellees, were mailed to the appellant on August 20, 1938.

The testimony further reflects that appellees and these salesmen were informed that they could not work for the new company until after the thirty days' notice had expired.

Appellees continued to serve appellant until they received a letter from appellant dated August 27, 1938, in which they were informed that their resignations were not accepted, but on the other hand they were discharged for cause, which was not stated.

It further appears that up until the receipt of this letter of discharge appellees had continued to work for appellant and both had produced business within the week prior thereto, Bell having sold one $6,000 contract for appellant. Neither sold any stock for the new corporation until after the discharge notice. They had sold no investment certificates for the new corporation. The new company was not authorized to sell investment certificates until October 7, 1938.

The record further reflects that on August 16th appellees and their associates applied to the State Securities Commissioner of Arkansas for authority to sell shares of the capitol stock of the new company (Arkansas Fund, Inc.) and on August 19th they obtained this authorization, and on the same day applied for salesmen's licenses for twenty-three of appellant's Arkansas salesmen to sell the stock of the new company and that five licenses were immediately issued.

As has been indicated, much evidence by both parties has been brought into this record. We think it unnecessary to set it out more at length for to do so would

serve no useful purpose and would unduly extend this opinion. Suffice it to say that after a careful review and consideration of all the testimony we have reached the conclusion that the findings of the learned chancellor are not against the preponderance thereof.

Appellant first insists that no cause was stated in the complaint of appellees that would give jurisdiction to a court of equity. In determining this question we must look to the allegations of the complaint. *Graysonia, Nashville & Ashdown Railroad Company* v. *Newberger Cotton Company,* 170 Ark. 1039, 282 S. W. 975.

It is alleged in the complaint that appellees were unable to determine the amount of commissions and bonuses to which they were entitled, that the company alone had this information, and, therefore, an accounting was sought to determine the total commissions and bonuses due them at the time the suit was filed. We think this allegation was sufficient to give the chancery court jurisdiction and that no error was committed in overruling appellant's demurrer.

Appellant next urges "that appellees grossly violated both (a) the express provisions of the contracts under which they were employed by appellant and (b) the fundamental principles of law and equity governing the relationship between principal and agent; therefore appellant has the right, either by reason of the terms of the contract of employment or by virtue of the principles of law and equity, to retain, as reimbursement for the grave damage wrought to appellant by appellees and their co-conspirators, the commissions and bonuses accrued and accruing to appellees."

It will be observed that appellees resigned their positions with appellant in a letter dated August 20, 1938, and that they were discharged by appellant on August 27. We think a preponderance of the testimony reflects that they continued in good faith to work for appellant until the date of their discharge, August 27. Thereafter they began the sale of stock in the new company (Arkansas Fund, Inc.) and after October 7, 1938, when the new company received its permit to sell securities, they began the solicitation for the sale of these securities.

Before their discharge they had permitted their names to be used in the incorporation of the new company and as its directors. Was the organization of the new company (Arkansas Fund, Inc.) by appellees and others, under the facts as disclosed by this record, in violation of the terms of the contracts in question? We do not think it was.

It is a general principle of law that the organization of a corporation during the employment to carry on a rival business after the expiration of the term of employment is not engaging in business.

In 18 R. C. L. 519, § 31, the author says: "Manifestly, when a servant becomes engaged in a business which necessarily renders him a competitor and rival of his master, no matter how much or how little time and attention he devotes to it, he has an interest against his duty and may be dismissed. It would be monstrous to hold that the master is bound to retain the servant in his employment after he has thus voluntarily put himself in an attitude hostile to his master's interest. But the mere planning by an employee during his contract of employment to engage after the expiration thereof in a competing business, does not justify his discharge, as a matter of law. And the organization during the term of his employment by the manager of a business, of a corporation to carry on a rival business after the expiration of such term, and the perfecting of arrangements for such business, have been held not to be ground for discharge from his position of manager."

In *Alfred J. Myers* v. *Roger J. Sullivan Company,* 166 Mich. 193, 131 N. W. 521, 34 L. R. A., N. S., 1217, the court held (quoting from the syllabus): "The organization during the term of his employment by the manager of the business, of a corporation to carry on a rival business after the expiration of such term, and the perfecting of arrangements for such business, is not ground for his discharge from his position of manager." And in the body of the opinion the court said:

"The complaint made by defendant is that by connecting himself with this corporation plaintiff put him-

self in an attitude of hostility towards defendant, and that of itself was sufficient cause for discharge. The facts are that the concern had not as yet entered into business, and did not propose to until the expiration of plaintiff's term of hiring. It amounted on the part of plaintiff to a mere planning for employment. One is entitled to seek other employment before he is on the street. The contrary would be a monstrous doctrine. A servant may not, while engaged in the service of his master, 'injure his trade or undermine his business; but everyone has a right, if he can, to better his situation in the world, and if he does it by means not contrary to law, though the master may be eventually injured, it is *damnum absque injuria*'.''

In the well-considered case of *Jones* v. *Ernst & Ernst,* 172 La. 406, 134 So. 375, in which the facts are quite similar to those in the instant case, principles of law applicable here are set out and in that case the court said:

''Plaintiff sued for an alleged balance due for salary for the first nine months of 1927. Defendant, a partnership, answered that the amount claimed was for a bonus, not for salary, which under its contract it was not obligated to pay; and, if not a bonus, that plaintiff by his disloyal acts had forfeited any claim thereto. Defendant also reconvened praying for the return of the amount paid plaintiff as salary during the period of his alleged disloyalty, for an amount due for overdrafts, and for the damages resulting from plaintiff's alleged disloyal activities. . . .

''Plaintiff resigned his position with defendant on thirty days' notice, the resignation becoming effective on October 1, 1927. Thereafter, plaintiff engaged in the business of accounting on his own behalf, several of the defendant's employees becoming associated with him therein.

''Defendant predicates its reconventional demand for the recovery of salary paid and for damages on plaintiff's alleged disloyalty in persuading certain of its employees to leave defendant and for failing to obtain renewal contracts from its regular clients.

"The employees who left defendant to engage in business with plaintiff were employed by defendant on a monthly basis only. We know of no law, and have been referred to none, which prohibited them at the end of any monthly period from leaving defendant's employ. On the contrary, we think that in consonance with the spirit of free labor they ought to be maintained in their right to do so. Certainly no action lies against plaintiff merely because he chose to employ them after they had left defendant's service. And this is so, even though plaintiff and defendant's former employees during their term of employment planned to engage in a competitive business at the expiration thereof. Every person has the right to better his condition if he can lawfully do so. . . .

"The plaintiff and his present associates rendered valuable service to defendant while in its employ, and the fact that they chose to leave that employment and engage in a competitive business does not authorize a recovery by defendant of the compensation received by plaintiff for his services. Nor does the fact that by reason of these acts of plaintiff and his associates defendant may have suffered some injury give rise to an action for damages in defendant's favor. They are *damnum absque injuria*."

On the whole record we conclude that the decree of the chancellor is correct, and accordingly we affirm.

Opinion delivered February 12, 1940.