PLASTICS RESEARCH & DEVELOPMENT CORP.
*v.* BILL NORMAN ET AL

5-4308                                    422 S. W. 2d 121

Opinion delivered December 18, 1967
[Rehearing denied January 22, 1968]

*Shaw, Jones & Shaw* and *Bethell & Pearce,* for appellant.

*Hardin, Barton, Hardin & Jesson,* for appellees.

CONLEY BYRD, Justice. This litigation between appellant, Plastics Research & Development Corporation, and appellees, Bill Norman and Rebel Manufacturing

Company, Inc., arises out of the manufacture and sale of a plastic fishing lure called "Rebel." At issue is (1) whether Bill Norman breached his employment contract with Plastics Research calling for 4 per cent of the net profits of their lure department, (2) the method of calculating the net profits for the lure department as distinguished from the net profits of appellant's whole operation, and (3) whether Bill Norman and Rebel Manufacturing are guilty of unfair competition in the marketing of an identical lure.

Bill Norman commenced the litigation by filing cause No. 3773 based on his contract of employment with Plastics Research, which provided in part:

"* * * 2. Employee will receive a base salary of $800.00 per month for the year November 1, 1964 through November 1, 1965. In addition thereto Employer agrees to pay to Employee, as a bonus 4% of the net profits of the Lure Department for the fiscal year November 1, 1964, ending November 1, 1965."

He prayed for an accounting of the net profits of the lure department and for a judgment for 4 per cent thereof. Appellant pleaded that Norman had breached his employment contract by incorporating "Rebel Manufacturing Company, Inc." on October 25, 1965, before his employment ended, and that Norman had solicited appellant's sales representatives to withhold orders to appellant until Rebel Manufacturing got into production of an identical lure. Prayer was that Norman take nothing on his complaint and that he be enjoined from using any information acquired while employed by appellant in the manufacture, promotion or sale of fishing lures. It was also asked that Norman be enjoined from engaging directly or indirectly in the manufacture of lures using the name "Rebel" or "Rebel Minnow."

Subsequently appellant filed cause No. 3858 against both Norman and Rebel Manufacturing, alleging unfair

competition and praying that Norman and Rebel Manufacturing be restrained from manufacturing a fishing lure similar to the "Rebel" lure, from using the name "Rebel" and from representing that appellant was in financial trouble, that Norman be directed to turn over to appellant any molds made from appellant's materials, and for damages.

The two causes were consolidated for trial. In cause No. 3858 the trial court found no unfair competition but did enjoin Norman from making statements to the effect that appellant was in such bad financial shape that it could not make delivery of goods. In cause No. 3773 the trial court found no breach of the employment contract by Norman and calculated the net income of the lure department to be $367,231.64, resulting in a judgment in Norman's favor of $14,689.26 for his bonus.

The record shows that Norman was in the fishing lure manufacturing business on his own, to some extent, at the time of his employment by appellant in the spring of 1963. Norman's first pay check from appellant was for $300 before deductions. By August 1964 his salary, by written agreement, had been increased to $15,000, and for the year ending October 31, 1965, he had a base contract for $800 per month plus 4% of the net profits of the lure department. Sales of the "Rebel" lure had climbed from nothing, at the time Norman was employed, to $893,884.50 for the year ending October 31, 1965. Appellant fired Norman on November 5, 1965.

A dispute between Norman and appellant about the net profits of the lure department had arisen before his discharge. Counsel was retained by Norman by October 18, 1965, and appellant was so notified on that date by Norman's counsel. Prior to June 20, 1965, statements showing sales and costs of purchases had been furnished to Norman, but because of labor problems between appellant and its employees no statements were furnished thereafter.

With reference to Norman's alleged breach of the employment contract, the record shows that he caused "Rebel Manufacturing Company, Inc." to be incorporated on October 25, 1965, six days before the termination of his employment contract. Prior to October 31 Norman had discussed with other employees the possibility of going into a competitive business. Furthermore, there was testimony by appellant's sales representatives that around November 1, 1965, Norman had solicited them to hold their orders until he could get into production.

The trial court found that Norman's conduct amounted to nothing more than a mere planning for employment upon the termination of his employment contract. The finding is amply supported by the record and is in accord with our prior cases. In *Hamilton Depositors Corp.* v. *Browne,* 199 Ark. 953, 136 S. W. 2d 1031 (1940), we recognized that merely organizing a corporation during employment to carry on a rival business after expiration of the term of employment did not amount to a breach of an employment contract. One is entitled to seek other employment before he is on the street.

The net profits of the lure department present the most difficult issue in this litigation. Obviously "net profit" means that which is left after payment of necessary expenses. The dispute here is complicated by appellant's departmentalized accounting and the allocation of indirect expenses among its several departments. The departmentalized accounting and intercompany charges were explained by Loren Janes, appellant's accountant, in this manner:

"Q.  Now, take for instance, as I understand it, your plant is departmentalized?

A.  Yes.

Q.  Now mention has been previously made about charges to various departments. You have

also outside customers do you not, such as Norge and so forth?

A. Yes.

Q. Are they charged on the same basis as your departments?

A. No

Q. What is the difference?

A. It is a compromise difference, but essentially it is half the profit potential or 10% less is just what it about amounts to. Exactly what it amounts to, in fact, the in the Lure Department for instance. [sic]

Q. I don't understand that. Exactly what do you mean?

A. In the case of Norge, we would take a job, we would take a mold to run in our press, we would charge them at $8.00 per hour per thousand pieces plus material at cost, or reasonably therefor.

Q. What did this $8.00 encompass?

A. This covers everything including profit for the Production Department.

Q. Now, assume that the same item was manufactured for the Lure Department.

A. You would charge it at $7.20 per hour."

Janes testified that when a payroll was written, he directly allocated charges in labor hire, labor production, labor tooling, or labor overhead; and that when a person worked in a department his labor cost was directly charged to that department, but with overhead labor, the cost was spread according to an allocation agreed upon between the department heads, including Norman.

With reference to supplies and expenses, Janes testified that they were allocated each month on the basis of each department's outside sales as a percentage of the company's total outside sales. Thus, if the lure department sold 50 per cent of. the sales of the whole company, the production department 30 per cent and the tooling department 20 per cent, these supplies would be charged on the basis of 50 per cent of the cost, say, of printing checks, to the lure department, 30 per cent to the production department and 20 per cent to the tooling department.

The records kept monthly by Janes show many discrepancies between the monthly allocations and the final allocations. For instance, the total "Direct Labor" shown on the monthly books was $84,441.51, whereas the total calculated by appellant after Norman was fired was $98,005.18. No explanation is given for the nearly $14,000 difference. The cost of purchases, as shown by the monthly books, was $148,039.70, but appellant's final calculation showed this figure to be $280,023.02.

The discrepancy in the figures involving cost of purchases was demonstrated in the following manner. Janes showed that for the eight months ending June 30, 1965, sales totaled $707,992.47 and purchases totaled $180,019.09, being a cost-to-sales ratio of 24.3 per cent. Sales on September 30 totaled $849,863.87 and purchases to the same date totaled $206,016.55, being a ratio of 24.2 per cent. Sales on October 31 totaled $893,884.50, but purchases had climbed to $280,023.02, for a cost-to-sales ratio of 31.3 per cent. By subtracting the September 30 total sales of $849,863.87 from the October 31 total of $893,884.50, and the total cost of purchases as of September 30 ($206,016.55) from the October 31 total ($280,023.02), we find that while sales increased only by $44,020.63 for October, the cost of purchases increased by $74,006.47. With respect to the October purchases, Janes testified (as abstracted by appellant):

*"I have testified that the figures were kept monthly on each department.* I have a breakdown on the cost allocated to the lure department including outside purchases for October, 1965. That figure is $12,676.62. I am a dime off in my reconciliation, the outside invoices total $4,229.86. That's outside purchases as evidenced by invoices. The lure molding charge for the production department to the lure department for the month of October was $5,816.00 even. The lure metalizing charge for metalizing the lures for the month of October was $2,694.57. There was an audit adjustment and I have got the adjustment in a box, but there was an additional $63.91 minus due to an audit adjustment. I didn't have the time last night to actually track it down. So we actually reduced the purchases by $63.91 and that should total with the 10-cent error that should total to $12,676.62. That is the figure that is reflected on the monthly financial statement of the lure department. With reference to Plaintiff's Exhibit 15 that does not reflect all the outside purchases for the lure department. It could not because there is only $3,000.00 here and we entered $4,000.00. It could not, they have missed something."* (Emphasis supplied.)

The general ledger kept by Janes also showed an inventory for October 31 of $153,889.66 and a $44,049.82 adjustment which Janes stated was due to defective lures removed from inventory and placed in a warehouse. While Janes was sure of the inventory loss because of defects, yet both he and Mr. Perrin, appellant's president, testified that everything shippable from the lures placed in the warehouse had been shipped by October 31.

Many other unexplained discrepancies appear in appellant's calculation of income for the lure department. For instance, Janes testified that costs of supplies and expenses were allocated monthly. By the monthly records the total of the costs allocated to the

lure department was $4,560.60, but in appellant's subsequent tabulation of income for the lure department $9,178.30 had been allocated for these costs. In the matter of executive salary allocation, there was included in the lure department's charges for 1965 the sum of $5,600 paid to Norman in 1965 as the bonus on his 1964 contract.

Furthermore, in connection with the net profits issue the record shows a number of accounting exhibits, which were referred to by the witnesses sometimes by exhibit number and sometimes as "that statement." None of the exhibits was abstracted, even though it would not have been impracticable to do so.

Under this state of the record, we are unable to say that the trial court's finding of net income, substantially upon the basis of appellant's general ledger, is not supported by the evidence. Because of the many discrepancies, he could very well have disregarded the allocations of indirect expenses made by appellant's accountants following Norman's dismissal.

On the issue of unfair competition, the record is clear that the "Rebel" lure was copied from the "Rapalla" lure, a balsam wood product from Finland. The difference is that the "Rebel" lure is made of plastic and has some other refinements, such as floating depth and the manner and location of the hook attachments. There is no doubt that Norman's minnow is a copy of the appellant's. Furthermore, the testimony was that appellant had expended in excess of $100,000 advertising its minnow as the "Rebel Minnow" and the "Amazing Rebel Minnow." Norman advertised his minnow as the "Reb-1" and as the "Amazing Minnow." He used the same series number to identify the size of his minnows as did appellant.

Norman's right to copy appellant's "Rebel" minnow is guaranteed to him by the federal patent laws, see

*Sears, Roebuck & Co.* v. *Stiffel Co.,* 376 U. S. 225 (1964). However, this does not mean that he can poach on appellant's advertising in such manner as to palm off his product as that of appellant. Nor is it necessary for appellant to prove actual deception of customers before he is entitled to an injunction where that is the natural and probable result of Norman's conduct, *Robert Reiss & Co.* v. *Herman B. Reiss, Inc.,* 63 N. Y. S. 2d 786 (1946).

Exhibit J-1, Norman's "Amazing Minnow," is packaged in a blue and white box similar to that of appellant's "Rebel" (Exhibit J-2). Where appellant has the word "Rebel" printed in white on the blue background with the Confederate flag in the top of the letter "R," Norman has two crossed Confederate flags in similar red and white on the blue background. On the white portion of the box Norman has in red the words "Amazing Minnow." Appellant, on the white portion of its box, has in red an outline of its lure. On the white ends of the boxes both exhibits have either stamped or printed thereon "103 Blue." Thus it is seen that confusion is the natural and probable result of Norman's conduct in the packaging of his product.

Consequently we hold that the trial court, in addition to its action with reference to appellant's financial condition, should have enjoined Norman and Rebel Manufacturing Company, Inc., from using the words "rebel," "Reb-1" or "amazing" in connection with the marketing of its minnows. This includes also the word "Rebel" in the Rebel Manufacturing Company, Inc. Nor do we think it was permissible for Norman to use the same series number to designate the color and sizes of his minnows—there is a considerable difference between the use of "9" and "99'r" in the case of *James Heddon's Sons* v. *Millsite Steel & Wire Works,* (6 Cir., 1942) 128 F. 2d 6, and the exact duplication of the series here.

Appellant asked for damages but the abstract fails to show any damages to have been sustained. Therefore its claim for damages is denied.

The bonus judgment is affirmed. We are reversing and remanding this cause with directions to enter an injunction restraining Norman's and Rebel Manufacturing Company's unfair competition in accordance with this opinion.